# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

RISHI BHASIN; ANNE JAMES;
NELSON OTERO; FIRST PLUS
FUNDING, INC.; FIRST ALLIED
FINANCIAL SERVICES, INC.; and
RELIANCE MORTGAGE SERVICE,
on behalf of themselves and all others
similarly situated,

      Plaintiffs,

vs.

UNITED SHORE FINANCIAL
SERVICES, LLC d/b/a UNITED
WHOLESALE MORTGAGE,

      Defendant.

Case No.:

Hon.

## CLASS ACTION COMPLAINT

Plaintiffs Rishi Bhasin, Anne James, Nelson Otero, First Plus Funding, Inc., First Allied Financial Services, Inc., and Reliance Mortgage Service (collectively "Plaintiffs" or the "Brokers"), on behalf of themselves and all others similarly situated, file this complaint against Defendant United Shore Financial Services, LLC d/b/a United Wholesale Mortgage ("Defendant" or "UWM") based on personal knowledge with respect to their own acts and on information and belief with respect to all other matters.

## I.   INTRODUCTION

1.     This is a class action brought by Plaintiffs on behalf of all individuals ("the Class") who are contractually entitled to commissions or charged back commissions for bringing Defendant UWM customers who acquired mortgages after March 18, 2019 but before September 19, 2019 and had not paid off their loans within 180 days of funding.

2.     Plaintiffs are mortgage brokers who currently and/or previously contracted with UWM, a mortgage lender, to sell UWM's mortgages to Plaintiffs' clients.  Under the terms of these contracts, UWM agreed to pay a commission to Plaintiffs for each client who entered into a UWM mortgage.  However, if a borrower paid off their loan within 180 days, then the contract required that the Plaintiffs return the commission for that deal.  Pursuant to these contracts, Plaintiffs found customers for UWM mortgages and encouraged the borrowers to avoid refinancing

their loans for at least 180 days.

3.      In the spring of 2020, UWM began to have financial troubles.  It informed approximately 100 contracted brokers in California that it was retroactively amending its contracts so that borrowers would be required to hold onto their loans for 365 days otherwise the brokers would need to return their commissions.  UWM also started sending out invoices to these brokers for the return of commissions from mortgages they had issued prior to UWM's announcement and which had been entered within 180 to 365 days after inception.  Similarly, UWM has been withholding commissions to offset commissions from mortgages that the brokers had issued prior to UWM's announcement and which had been entered within 180 to 365 days after inception.

## II.    THE PARTIES

4.      Plaintiff Rishi Bhasin ("Mr. Bhasin") is currently, and at all times relevant to the action has been, a citizen and resident of California.  Mr. Bhasin is the principal officer and sole owner of First Plus Funding, Inc.

5.      Plaintiff First Plus Funding, Inc. is, and at all relevant times has been, a corporation duly organized and existing under and by virtue of the laws of the State of California with its headquarters and principal place of business in California.

6.      Plaintiff Anne James ("Ms. James") is currently, and at all times relevant to the action has been, a citizen and resident of California.  Ms. James is the

principal officer and sole owner of Reliance Mortgage Service, Inc.

7.      Plaintiff Reliance Mortgage Service, Inc. is, and at all relevant times has been, a corporation duly organized and existing under and by virtue of the laws of the State of California with its headquarters and principal place of business in California.

8.      Plaintiff Nelson Otero ("Mr. Otero") is currently, and at all times relevant to the action has been, a citizen and resident of California.  Mr. Otero is the principal officer and sole owner of First Allied Financial Services.

9.      Plaintiff First Allied Financial Services is, and at all relevant times has been, a corporation duly organized and existing under and by virtue of the laws of the State of California with its headquarters and principal place of business in California.

10.     Defendant United Shore Financial Services, LLC d/b/a United Wholesale Mortgage ("Defendant" or "UWM") is, and at all relevant times has been, a corporation duly organized and existing under and by virtue of the laws of the State of Michigan with its headquarters and principal place of business in Pontiac, Michigan.

### III.    JURISDICTION AND VENUE

11.     The Court has subject matter jurisdiction over Plaintiffs' class claims pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because the

combined claims of the proposed Class Members exceed $5 million, Defendant and Plaintiffs are citizens of different states, and there are at least 100 members of the putative class. Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative Class Members are aggregated. 28 U.S.C. § 1332(d)(6).

12.     This Court has personal jurisdiction over the Defendant because it is headquartered and regularly conducts business in this District.

13.     Venue is proper in this District pursuant to: (1) 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District; and (2) 28 U.S.C. § 1391(b)(3) in that Defendant is subject to personal jurisdiction in this District.

14.     All conditions precedent to this action have occurred, been performed, or have been waived.

## IV.     FACTUAL BACKGROUND

### A. Common Allegations

15.      Defendant utilizes the Wholesale Lending Agreement with Plaintiffs and each of the putative Class Members.  Upon information and belief, the Wholesale Lending Agreement is a form contract that UWM created and into which it enters with all of its contracted brokers.  Under the terms of the Wholesale Lending Agreement, UWM agreed to underwrite mortgage loans from Brokers' clients if

certain conditions were met, and in exchange, UWM agreed to pay a broker's commission.

16.     The Wholesale Lending Agreement notes that a broker will be compensated for each Mortgage Loan obtained:

> when a Mortgage Loan is closed and funded by UWM and Broker has: (a) obtained in writing from UWM a firm commitment for UWM's interest rate, discount rate and ancillary fees; (b) successfully negotiated with the borrower(s) any fees in excess of UWM's fees for the Mortgage Loan; and (c) negotiated a spread premium fee from UWM for the Mortgage Loan, if applicable. … Broker shall not be entitled to any fee if a Mortgage Loan does not fund, regardless of the reason. … If the mortgagor(s) fails to make any one (1) or more of the first three (3) mortgage payments due on his/their Mortgage Loan by the last day of the month in which the payment is due, then Broker shall promptly reimburse UWM for all amounts paid by UWM to Broker in connection with said Mortgage Loan.

**Exhibit A**, at ¶ 2.04.

17.     Broker commissions, however, are subject to return or refund if the Loan is repaid early.  These Wholesale Lending Agreements' "Early Payoff" clauses provide that:

> … should any Mortgage Loan delivered hereunder be paid off within one hundred eighty (180) days of the funding of such Mortgage Loan for any reason, Broker shall promptly deliver to UWM the greater of: (a) any credit for the rate paid by UWM to the borrower or Broker, in the aggregate: or (b) one (1%) of the amount of the Mortgage Loan.

*See Id.*, at ¶ 7.17.

18.     The Wholesale Lending Agreement outlines established and enumerated criteria for a broker's entitlement to their commission(s).  Accordingly,

payment of these commissions is not optional and is a material term of the Wholesale Lending Agreement. This compensation language is unambiguous and the parties have performed under this Agreement for a significant amount of time.

19.    The Wholesale Lending Agreement also provides for the governing law of the agreement: "Agreement shall be governed by, and construed and enforced in accordance with, applicable federal laws and the laws of the State of Michigan, without reference to conflict of laws principles." *Id.*, at ¶ 7.15. Accordingly, regardless of the location of the countersigning party, the Wholesale Lending Agreement will be interpreted under a single law.

20.    The Wholesale Lending Agreement states that the parties are to bring matters arising out of the agreement before this Court and consent to its jurisdiction:

> the parties to this Agreement hereby unconditionally and irrevocably: (a) submit to the exclusive jurisdiction of the Oakland County (Michigan) Circuit Court, or in the event that original jurisdiction may be established, the United States District Court for the Eastern District of Michigan, Southern Division, sitting in Detroit, Michigan (hereinafter the "Courts"), in any action arising out of this Agreement; (b) agree that all Claims in any action must be decided in one of said Courts; and (c) waive, to the fullest extent that they may effectively do so, the defenses of: (i) lack of subject matter jurisdiction of such Courts; (ii) the absence of personal jurisdiction by such Courts over the parties to this Agreement; and (iii) forum non-conveniens.

*Id.*

21.    Defendant retained the right to amend the Wholesale Lending Agreement, subject to notice:

This Agreement, and UWM's policies, procedures, requirements and instructions concerning Mortgage Loan Applications and Mortgage Loans, including but not limited to those contained in the UWM Guide, may be amended by UWM from time to time, and UWM will endeavor to provide broker with prompt notice thereof, which may occur by posting any such amendments on UWM's website, which Broker is required to regularly check and monitor as a condition of this Agreement. Broker agrees that the submission of any Mortgage Loan Applications or Mortgage Loans to UWM after such amendment shall be Broker's agreement to the amendment without further signature or consent of any kind. Any such amendment shall apply to pending, and/or future Mortgage Loan Applications submitted by Broker.

*Id.*, at ¶ 7.08.  However, the Wholesale Lending Agreement explicitly provides that any amendments shall only apply to pending, and/or future Mortgage Loan Applications submitted by Broker.  UWM may not make retroactive changes to its compensation structure.

22.  On March 17, 2020, UWM sent an email to approximately 100 brokers, including Plaintiffs, who contracted with UWM.  The email included a video from UWM's Executive Vice President Allen Beydoun.  Through both the email and the video, UWM accused Mr. Bhasin, Ms. James, Mr. Otero and the other approximately ninety-seven brokers of "participating in refinancing practices that are having a negative impact on the entire wholesale market."  The email stated that UWM would be changing its contracts with these brokers so that the mortgage loans could not be refinanced or paid off within twelve months without the brokers having to return their broker commission.

23.  UWM claimed in the email to be implementing the new terms only on

7

loans closed from March 12, 2020 forward, yet this was not the case.  Following

receipt of the email, UWM applied this twelve-month "Early Payoff" Policy to all

of its clients' loans that had closed within the last year.

24.    UWM's unilateral and retroactive change to the "Early Payoff"

provision is a breach of the Wholesale Lending Agreement and breach of the

covenant of good faith and fair dealing included in all commercial contracts.

25.    Under the Wholesale Lending Agreement, Plaintiffs and other Class

Members are entitled to damages in the amount of the improperly withheld or

invoiced broker commissions, including any interest resulting therefrom.

Additionally, the Wholesale Lending Agreement provides for attorneys' fees and

costs:

> In the event a dispute arises under this Agreement between Broker and UWM, which dispute results in legal action being taken by one or both of the parties, the prevailing party shall be entitled to recover its reasonable attorney fees, costs and other expenses associated with the enforcement of its rights under this Agreement, and the non-prevailing party hereby agrees to promptly pay same.

**Exhibit A**, ¶ 7.16. Thus, if Plaintiffs prevail, UWM must pay the attorneys' fees and

costs associated with this dispute.

### B. Plaintiffs' Experiences Under the Wholesale Lending Agreement

26.    The experiences of the each of the named Plaintiffs confirm the uniform

nature of Defendant's unlawful business practices as to the Class.

a.   <u>Rishi Bhasin and First Plus Funding, Inc.</u>

27.    Mr. Bhasin is the owner and principal of First Plus Funding, Inc.  First

Plus Funding, Inc. is a mortgage broker that advises and assists clients with acquiring

residential mortgages.  Like other Class Members, First Plus Funding, Inc. entered

into a Wholesale Lending Agreement with Defendant UWM on February 20, 2014.

A copy of this contract is attached as **Exhibit A**. The contract has annually and

automatically renewed under the terms of the February 20, 2014 agreement; the last

renewal was on March 30, 2020.

28.    Since entering into the Wholesale Lending Agreement with UWM, Mr.

Bhasin and First Plus Funding, Inc. have brought numerous customers to UWM.

Mr. Bhasin would encourage all of his customers to hold onto the UWM loans and

avoid refinancing their property for 180 days.

29.    At the time of the "Early Payoff" policy change, First Plus Funding,

Inc. had a number of clients with UWM loans that had closed more than six months

but less than a year prior to the March 17, 2020 email.

30.    On or about May 1, 2020, UWM sent First Plus Funding, Inc. an

invoice. The first page of the invoice states:

> You have incurred an Early Payoff with United Wholesale Mortgage.
> United Wholesale Mortgage has on file the fully executed Wholesale
> Lending Agreement for your company. This agreement specifically
> states "UWM is committed to the long term performance of its loans.
> As such, should any Mortgage Loan delivered hereunder be paid off
> within one hundred eighty (180) days of the funding of such Mortgage

Loan for any reason, Broker shall promptly deliver to UWM the greater of: (a) any credit for the rate paid by UWM to the borrower or Broker, in the aggregate; or (b) one (1%) percent of the amount of the Mortgage Loan."

31.     The invoice declares that First Plus Funding, Inc. owes UWM $77,146.37 for the early payoff of a number of loans that it lists.  All of the loans listed were funded prior to March 12, 2020.  All of the loans, with the exception of one, were not paid off by the borrowers within at least 180 days of their closing.

32.     UWM has improperly charged Mr. Bhasin and First Plus Funding, Inc. for early refinances when the refinances were both well after the 180 days and the original loans were issued nearly one year ago.

> b.  Anne James and Reliance Mortgage Service

33.      Anne James is the principal officer and sole owner of Reliance Mortgage Service, Inc. ("Reliance").  Reliance is a mortgage broker that advises and assists clients with acquiring residential mortgages.  On January 28, 2014, Reliance entered into a Wholesale Lending Agreement with Defendant UWM.  This contract is substantively identical to **Exhibit A**. The contract has annually and automatically renewed under the terms of the January 28, 2014 contract; the last renewal was on March 23, 2020.

34.     Since entering into the Wholesale Lending Agreement with UWM, Ms. James and Reliance have brought numerous customers to UWM.  Ms. James and Reliance would encourage all of their customers to hold onto the UWM loans and

avoid refinancing their property for 180 days.

35.    At the time of the "Early Payoff" policy change, Reliance had a number of clients with UWM loans that had closed more than six months but less than a year prior to the March 17, 2020 email.

36.    On or about May 1, 2020, UWM sent Reliance and invoice.  The first page of the invoice states:

> You have incurred an Early Payoff with United Wholesale Mortgage. United Wholesale Mortgage has on file the fully executed Wholesale Lending Agreement for your company. This agreement specifically states "UWM is committed to the long term performance of its loans. As such, should any Mortgage Loan delivered hereunder be paid off within one hundred eighty (180) days of the funding of such Mortgage Loan for any reason, Broker shall promptly deliver to UWM the greater of: (a) any credit for the rate paid by UWM to the borrower or Broker, in the aggregate; or (b) one (1%) percent of the amount of the Mortgage Loan."

37.    The invoice declares that Reliance owes UWM several thousand dollars for the early payoff of a number of loans that it lists.  All of the loans listed were funded prior to March 12, 2020.  All of the loans, with the exception of one, were not paid off by the borrowers within at least 180 days of their closing.

38.    UWM has withheld commissions from Ms. James and Reliance charged them for early refinances when the refinances were both well after the 180 days and the original loans were issued nearly one year ago.

c.   Nelson Otero and First allied Financial Services, Inc.

39.    Nelson Otero is the principal officer and sole owner of Mr. Otero is the

principal officer and sole owner of First Allied Financial Services ("First Allied"). First Allied is a mortgage broker that advises and assists clients with acquiring residential mortgages. Prior to 2019, First Allied entered into a Wholesale Lending Agreement with Defendant UWM. The contract has annually and automatically renewed under the terms of the contract.

40.     Since entering into the Wholesale Lending Agreement with UWM, Mr. Otero and First Allied have brought numerous customers to UWM. Mr. Otero and First Allied would encourage all of their customers to hold onto the UWM loans and to avoid refinancing their property for 180 days.

41.     At the time of the "Early Payoff" policy change, First Allied had a number of clients with UWM loans that had closed more than six months but less than a year prior to the March 17, 2020 email.

42. On or about April 27, 2020, UWM sent First Allied an invoice. The first page of the invoice states:

> You have incurred an Early Payoff with United Wholesale Mortgage. United Wholesale Mortgage has on file the fully executed Wholesale Lending Agreement for your company. This agreement specifically states "UWM is committed to the long term performance of its loans. As such, should any Mortgage Loan delivered hereunder be paid off within one hundred eighty (180) days of the funding of such Mortgage Loan for any reason, Broker shall promptly deliver to UWM the greater of: (a) any credit for the rate paid by UWM to the borrower or Broker, in the aggregate; or (b) one (1%) percent of the amount of the Mortgage Loan."

43.     The invoice declares that First Allied owes UWM $10,449.35 for the

early payoff of a number of loans that it lists.  All of the loans listed were funded prior to March 12, 2020.  All of the loans were not paid off by the borrowers within at least 180 days.

44.     UWM has withheld commissions from Mr. Otero and First Allied and charged them for early refinances when the refinances were both well after the 180 days and the original loans were issued nearly one year ago.

## V.     CLASS ACTION ALLEGATIONS

45.     Plaintiffs bring this action individually and as representatives of all similarly situated mortgage brokers, pursuant to Federal Rule of Civil Procedure Rule 23, on behalf of the below-defined Class:

> All Brokers who contracted with UWM under the Wholesale Lending Agreement (or similar agreement) and whose commissions were withheld or who were invoiced for commissions on loans that were paid off over 180 days after funding by UWM.

Excluded from the above-defined Class are Defendant and its officers, directors, and employees; any entity in which the Defendant has a controlling interest, the Defendant's affiliates, legal representatives, attorneys, heirs or assigns; the Defendant's immediate families; any federal, state, or local government entity, any judge, justice, or judicial officer presiding over this matter, the members of their immediate families, their judicial staffs, persons whose claims in this matter have been finally adjudicated on the merits or otherwise released, Plaintiff's counsel and Defendant's counsel, and the legal representatives, successors, and assigns of any

such excluded person.

46.     As used in the proposed class definition above, the terms "Broker," in the definition of the class (above) have the same meanings as in the UWM contracts.

47.     Plaintiffs reserve the right to modify or amend the definition of the proposed class and/or sub-classes before the Court determines whether certification is appropriate.

## Numerosity – Fed. R. Civ. P. 23(a)(1)

48.     The members of the Class are so numerous and geographically disperse that individual joinder of all members is impracticable.   While Plaintiffs are informed and believe that there are 100 members of the Class, the precise number of Class members and their addresses are presently unknown to Plaintiffs, but may be reasonably ascertained from UWM's records and files.   Similarly, Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

## Commonality and Predominance –   Fed. R. Civ. P. 23(a)(2) and 23(b)(3)

49.     Cases involving statutes and contracts are particularly well-suited for class treatment because the Class Members face the same common questions of fact and law. *Mich Ass'n of Chiropractors v. Blue Cross Blue Shield of Mich.,* 300 Mich. App. 551, 834 N.W.2d 148 (2013); *Thompson v. Cmty. Ins. Co.,* 213 F.R.D. 284,

292 (S.D. Ohio 2002)(citing *Kleiner v. First Nat'l Bank of Atlanta,* 97 F.R.D. 683, 691 (N.D.Ga. 1983) ("[C]laims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such."); *Peters v. Cars to Go, Inc.,* 184 F.R.D. 270 (W.D.Mich.1998).

50.     Upon information and belief, Defendant utilized a form contract through which it contracts all of its brokers. Thus, Defendant's legal obligations to its brokers under said contracts are identical for all Class Members.

51.     Predominance is a question of efficiency. *See Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 615–16, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); Committee Notes to 1966 Amendment to Fed.R.Civ.P. 23; William B. Rubenstein, 2 *Newberg on Class Actions* § 4:49 (5th ed. 2012). The predominance inquiry asks "Is it more efficient, in terms both of economy of judicial resources and of the expense of litigation to the parties, to decide some issues on a class basis or all issues in separate trials?" *Butler v. Sears, Roebuck & Co.,* 702 F.3d 359, 362 (7th Cir. 2012), *cert. granted*, *judgment vacated*, 569 U.S. 1015 (2013), *and judgment reinstated,* 727 F.3d 796 (7th Cir. 2013).

52.     A class action is the more efficient procedure for determining liability and damages in a case such as this, where each Class Member signed the same contract, and were damages can be determined formulaically.

53.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and the other Class Members. Similar or identical violations, business practices, and injuries are involved, and the contractual rights involve uniform, objective questions of fact and law, both for the prosecution and for the defense. The common questions of fact and law existing as to all Class Members predominate over questions affecting only individual class members. Such common questions of fact and law include, but are not limited to: the proper interpretation of the Wholesale Lending Agreement; whether Defendant can unilaterally change the compensation provisions therein; whether Defendant breached the Agreement; and whether Plaintiffs are entitled to damages and other monetary relief and, if so, in what amount. Individual questions, if any, pale by comparison, both in quality and quantity, to the numerous common questions that predominate in this action. Thus, the elements of commonality and predominance are both met.

## Typicality – Fed. R. Civ. P. 23(a)(3)

54.     This test "limit[s] the class claims to those fairly encompassed by the named plaintiffs' claims." *In re American Med. Sys., Inc.,* 75 F.3d 1069, 1082 (6th Cir.1996) (citation and quotation omitted). The named class representatives meet the criteria for typicality.

55.     Typicality does not mean the same claims or facts. *Senter v. General*

*Motors Corp.,* 532 F.2d 511, 525 n. 31 (6th Cir. 1976), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976): "[t]o be typical a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law."

56.    Here, typicality requires class representatives who, in their role as mortgage brokers, contracted with Defendant to sell Defendant's mortgages and whose commissions for loans that were paid off more than 180 days after Defendant's funding have been withheld. Furthermore, Plaintiffs' claims are typical of those of the members of the Class because, among other things, all class members were comparably injured through Defendant UWM's common course of unlawful conduct and seek the same kind of relief.

57.    To be sure, there are no defenses available to Defendant that are unique to individual Plaintiffs.  The injury and causes of actions are common to the Class as all arising from the same contractual relationship and involve the same breach. All Class Members', and each class representative's, claims for commissions or charged back commissions derive from loans that were paid off more than 180 days after closing.

58.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual

actions alleging the same claims.

## Adequacy of Representation – Fed. R. Civ. P. 23(a)(4)

59.    Plaintiffs will adequately represent the class.  They have no interests that are in conflict with those of the class.  In addition, they have retained counsel competent and experienced in complex, as well as contract, class action litigation, and they will prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

## Superiority of Class Treatment – Fed. R. Civ. P. 23(b)(3)

60.    The class action is superior to any other available procedures for the fair and efficient adjudication of these claims, and no unusual difficulties are likely to be encountered in the management of this class action. Upon information and belief, the class is too large to make joinder practicable.  The Plaintiffs estimate that the class will include 100 people.  It would be an unnecessary burden upon the court system to require these individuals to institute separate actions.   Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

## Particular Issues – Fed. R. Civ. P. 23(c)(4)

61.     In the event unforeseen issues preclude class certification under Fed.R.Civ.P. 23(b)(3), the case is still appropriate for class certification under Fed.R.Civ.P. 23(c)(4), as to the particular issues of liability.

62.     Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making declaratory relief, as described below, with respect to the Class as a whole.

## VI.    CLAIMS

### FIRST CAUSE OF ACTION
**(Breach of Contract)**

Plaintiffs, individually and on behalf of the classes, for a first cause of action against Defendant for breach contract, allege:

63.     Plaintiffs incorporate by reference each and every paragraph of the General Allegations as though set forth in full in this cause of action.

64.     Each Plaintiff, and by definition the Class, are persons who, pursuant to their Wholesale Lending Agreement with Defendant, are entitled to commissions or charged back commissions for delivering mortgage loans to Defendant that were not paid off within 180 days of funding.

65.     Likewise, under Michigan state contract law, "[w]here a party to a contract makes the manner of its performance a matter of its own discretion, the law does not hesitate to imply the proviso that such discretion be exercised honestly and

in good faith." *Burkhardt v. City Nat'l Bank of Detroit*, 57 Mich.App. 649, 266 N.W.2d 678, 680 (1975).

66.     Once the loans reached the one hundred and eighty-first day post-funding and had not been paid off, Defendant was responsible for "promptly" delivering each broker's commission or charged back commission.

67.     The calculation of the commissions to be paid was explicitly outlined in the Wholesale Lending Agreement.

68.     Defendant UWM entered into virtually identical contracts with the Plaintiffs and each member of the class.  An exemplar of one such contract is attached as **Exhibit A**.

69.     Plaintiffs performed all of their contractual obligations.

70.     UWM breached its contractual duties owed to Plaintiffs by withholding commissions or charged back commissions on loans that were paid off over 180 days after funding in contravention of the contract.

71.     UWM similarly breached its Wholesale Lending Agreement by amending its "Early Payoffs" provision without proper notice and to retroactively apply to loans that had been closed and funded prior to the amendment.

72.     Plaintiffs are informed and believe and thereon allege that UWM breached its contractual duties owed to Plaintiff and the class by other acts or omissions of which Plaintiff is presently unaware and which will be shown

according to proof at the time of trial.

73.    As a proximate result of the aforementioned breach of contract by Defendant, Plaintiffs and the Class Members have suffered, and will continue to suffer in the future, damages under the contracts, plus interest, and other economic damages, for a total amount to be shown at the time of trial.

74.    Plaintiffs, and others similarly situated, request attorneys' fees under the terms of the contract.

## SECOND CAUSE OF ACTION
### (Declaratory Relief, 28 U.S.C. §§ 2201-2202)

Plaintiffs, individually and on behalf of others similarly situated, for a second cause of action against Defendant for declaratory relief, allege:

75.    Plaintiffs and the Class hereby repeat and re-allege all preceding paragraphs and incorporate the same as though fully set forth herein.

76.    An actual controversy now exists between the Parties regarding their rights and liabilities under their Wholesale Lending Agreement.  UWM is withholding payment, or demanding repayment, of amounts due under the Wholesale Lending Agreement.  Plaintiffs allege that such actions breach the Wholesale Lending Agreement.

77.    Accordingly, the parties require a declaration of the rights and obligations under the Wholesale Lending Agreement.

78.    Plaintiff and the Class request a declaration that UWM's amendment of

the "Early Payoffs" provision of their contract does not apply to loans that had been closed and funded prior to the proposed amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for relief and judgment as follows:

A.     For an order declaring that this action is properly maintained as a class action and appointing Plaintiffs as representatives for the Class, and appointing Plaintiffs' counsel as Class counsel;

B.     That Defendant bear the cost of any notice sent to the Class;

C.     For an order awarding Plaintiffs and the members of the Class actual damages;

D.     For an order awarding Plaintiffs and the members of the Class pre- and post-judgment interest;

E.     For an order awarding attorneys' fees and costs of suit, including experts' witness fees as permitted by law; and

F.     Such other and further relief as this Court may deem just and proper.

Respectfully submitted,

SOMMERS SCHWARTZ, P.C.

December 11, 2020              By:  */s/ Jason J. Thompson*
                              Jason J. Thompson (P47184)
                              Alana Karbal (P82908)
                              One Towne Square, 17th Floor

Southfield, Michigan 48076
(248) 355-0300
jthompson@sommerspc.com
akarbal@sommerspc.com

Trenton R. Kashima
SOMMERS SCHWARTZ, PC
402 West Broadway, Suite 1760
San Diego, CA  92101
(619) 762-2126
tkashima@sommerspc.com

Scott Glovsky
LAW OFFICES OF SCOTT GLOVSKY
343 Harvard Avenue
Claremont, CA  91711
(626) 243-5598

*Attorneys for Plaintiffs and
the Putative Class*