UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| RISHI BHASIN; ANNE JAMES; NELSON OTERO; FIRST PLUS FUNDING, INC.; FIRST ALLIED FINANCIAL SERVICES, INC.; and RELIANCE MORTGAGE SERVICE, on behalf of themselves and all others similarly situated, | Case No.: 2:20-cv-13278  Honorable Laurie J. Michelson  Magistrate R. Steven Whalen |
| Plaintiffs, | |
| vs. | |
| UNITED SHORE FINANCIAL SERVICES, LLC d/b/a UNITED WHOLESALE MORTGAGE, | |
| Defendant. | |

**DEFENDANT UNITED SHORE FINANCIAL SERVICES, LLC D/B/A
UNITED WHOLESALE MORTGAGE'S MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(b)(1) AND (12)(b)(6)**

Defendant United Wholesale Mortgage ("UWM"),[1] by and through its attorneys, The Miller Law Firm, P.C., move this Court to dismiss Plaintiffs Rishi Bhasin, Anne James, Nelson Otero, First Plus Funding, Inc., First Allied Financial Services, Inc., and Reliance Mortgage Service's Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). In support of its Motion, Defendant UWM relies upon its Brief in Support and the Exhibits attached thereto, concurrently filed herewith.

As Local Rule 7.1(a) requires, Defendant UWM's counsel attempted to confer with Plaintiffs' counsel on February 10, 2020 to seek concurrence in the relief sought by this Motion. Concurrence was not obtained, necessitating the filing of this Motion.

WHEREFORE, Defendant United Shore Financial Services, LLC d/b/a United Wholesale Mortgage respectfully requests that this Court grant its Motion, dismiss this action, and grant Defendant any other relief this Court deems is necessary and just.

---

[1] On December 14, 2020, Defendant United Shore Financial Services LLC changed its name to United Wholesale Mortgage, LLC.

1

Respectfully submitted,

By: */s/ E. Powell Miller*
E. Powell Miller (P39487)
Kevin F. O'Shea (P40586)
Ann L. Miller (P43578)
The Miller Law Firm, P.C.
950 W. University Drive, Ste. 300
Rochester, MI 48307
248-841-2200
epm@millerlawpc.com
kfo@millerlawpc.com
alm@millerlawpc.com

*Attorneys for Defendant*

Dated: October 14, 2021

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

RISHI BHASIN; ANNE JAMES;
NELSON OTERO; FIRST PLUS
FUNDING, INC.; FIRST ALLIED
FINANCIAL SERVICES, INC.; and
RELIANCE MORTGAGE SERVICE,
on behalf of themselves and all others
similarly situated,

      Plaintiffs,

vs.

UNITED SHORE FINANCIAL
SERVICES, LLC d/b/a UNITED
WHOLESALE MORTGAGE,

      Defendant.

Case No. 2:20-cv-13278

Honorable Laurie J. Michelson

Magistrate R. Steven Whalen

**BRIEF IN SUPPORT OF DEFENDANT UNITED SHORE FINANCIAL SERVICES, LLC D/B/A UNITED WHOLESALE MORTGAGE'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) AND (12)(b)(6)**

## **TABLE OF CONTENTS**

INDEX OF AUTHORITIES....................................................................... iii

INDEX OF MOST CONTROLLING AUTHORITIES ...........................................v

INTRODUCTION ...................................................................................1

FACTUAL BACKGROUND ........................................................................4

    A.    The Contracts Between UWM and the Independent
            Mortgage Brokers .................................................................4

    B.    UWM Provides Notice to a Limited Number of its Brokers of the
            New 12-Month EPO Provision .............................................6

    C.    The Jurisdictional Allegations in Plaintiffs' Complaint ......................9

            1.  The Amount-in-Controversy as Alleged in the Complaint..............9

            2.  The Number of Putative Class Members .......................................10

    D.    There are only 74 Affected Brokers from Whom UWM Received
            Less than $1 Million. .......................................................11

ARGUMENT .......................................................................................12

I.    THIS COURT LACKS SUBJECT MATTER JURISDICTION .................12

    A.    Standard of Review .........................................................12

    B.    Plaintiffs Lack Subject Matter Jurisdiction Under CAFA .................13

            1.    The Amount-in-Controversy in less
                  than $5 Million........................................................13

                  a.    The putative class is made whole for less
                      than $1 million..............................................14

       b.     Even if this Court factored in reasonable attorneys' fees, Plaintiffs could not reach the jurisdictional limit ...........16

       c.     The declaratory judgment claim places the same insufficient amount-in-controversy as the breach of contract claim...................................................................17

    2.     Plaintiffs Cannot Point to 100 Putative Class Members...........19

II.    THE INDIVIDUAL PLAINTIFFS SHOULD ALSO BE DISMISSED ......21

CONCLUSION .......................................................................23

# INDEX OF AUTHORITIES

## Cases

*Alinsub v. T-Mobile*, 414 F. Supp. 2d 825 (W.D. Tenn. 2006) ...............................14

*Ambler v. Thompson*, No. 325042, 2016 WL 1243425 (Mich. Ct. App. Mar. 29, 2016) .................................................................................................................14

*Blaszczyk v. Darby*, 425 F. Supp. 3d 841 (E.D. Mich. 2019), *appeal dismissed*, 2020 WL 3470326 (6th Cir. June 3, 2020) ....................................................................14

*Burton v. William Beaumont Hosp.*, 373 F. Supp. 2d 707 (E.D. Mich. 2005) ........22

*Charvat v. GVN Mich., Inc.*, 561 F.3d 623 (6th Cir. 2009) ....................................14

*Chaz Concrete Co., LLC v. Codell*, No. CIV A 3:03–52–KKC, 2006 WL 2453302 (E.D. Ky. Aug. 23, 2006) ................................................................................19

*Consol. Rail Corp. v. Grand Trunk W. R. Co.*, 853 F. Supp. 2d 666 (E.D. Mich. 2012) .............................................................................................................14

*Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81 (2014) .............13

*Defiance Hosp. v. Fauster-Cameron, Inc.*, 344 F. Supp. 2d 1097 (N.D. Ohio 2004) ...............................................................................................................23

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2nd Cir. 2006) ................................19

*DLX, Inc. v. Kentucky*, 381 F.3d 511 (6th Cir. 2004) .............................................12

*Freeland v. Liberty Mut. Fire Ins. Co.*, 632 F.3d 250 (6th Cir. 2011) ...................17

*Golden v. Gorno Bros.*, 410 F.3d 879 (6th Cir. 2005) ............................................12

*Hammond v. Hannin*, 21 Mich. 374 (1870) ............................................................14

*Hendricks v. DSW Shoe Warehouse, Inc.,* 444 F. Supp. 2d 775 (W.D. Mich. 2006) ...............................................................................................................15

*Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348 (1961) ............................................14

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977) .........................18

*In re Capital Contracting Co.*, 924 F.3d 890 (6th Cir. 2019) ................................20

*Kostrzewa v. City of Troy*, 247 F.3d 633 (6th Cir. 2001) .......................................22

*Koulianos v. Amiran*, No. 1-13-1060, 2014 WL 3943611 (Ill. App. Ct. Aug. 12, 2014) .............................................................................................................22

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .............................................20

*Mitan v. Int'l Fid. Ins. Co.*, 23 F. App'x 292 (6th Cir. 2001) ...................................21

*Nationwide Affordable Hous. Fund 27, LLC v. Urban 2004 Holding Co.*, No. 2:20-CV-1762, 2020 WL 3642575 (S.D. Ohio July 6, 2020)............................... 18, 19

*Petterman v. Haverhill Farms, Inc.,* 125 Mich. App. 30 (1983)............................17

*Public Funding Corp. v. Lawrence County Fiscal Court*, 1989 WL 153970 (6th Cir. Dec. 21, 1989)............................................................................................16

*RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125 (6th Cir. 1996) .....12

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ................................................ 19, 20

*United States v. Cnty. of Muskegon*, 298 F.3d 569 (6th Cir. 2002)........................15

*Wood v. DAIIE*, 413 Mich. 573 (1982)..................................................................17

*Zide Sport Shop of Ohio, Inc. v. Ed Tobergte Assocs., Inc.*, 16 Fed. App'x. 433 (6th Cir. 2001) ....................................................................................................18

*ZMC Pharmacy, LLC v. State Farm Mut. Auto. Ins. Co.*, 307 F. Supp. 3d 661 (E.D. Mich. 2018)............................................................................................22

**Statutes**

28 USC § 1332(d) ........................................................................... 13, 16, 19

**Rules**

Fed. R. Civ. P. 12 ............................................................... 3, 4, 12, 13, 21

**Secondary Sources**

Black's Law Dictionary 479 (9th ed. 2009) ............................................20

## <u>INDEX OF MOST CONTROLLING AUTHORITIES</u>

*Alinsub v. T-Mobile*, 414 F. Supp. 2d 825 (W.D. Tenn. 2006)

*Hendricks v. DSW Shoe Warehouse, Inc.*, 444 F. Supp. 2d 775 (W.D. Mich. 2006)

*Public Funding Corp. v. Lawrence County Fiscal Court*, 1989 WL 153970 (6th Cir. Dec. 21, 1989)

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016)

The Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)

## **INTRODUCTION**

This putative class action involves 74 independent mortgage brokers out of the 11,000 brokers who originate loans on behalf of consumers with Defendant United Wholesale Mortgage, LLC ("UWM")[1] as the lender. Plaintiffs are attempting to challenge a contractual change that UWM instituted regarding the "early payoff" provision ("EPO") contained in its standard Wholesale Broker Agreement (the "Broker Agreement"). The EPO is intended to curtail the potential for "churning" by brokers who encourage customers to refinance their loans on short intervals. Churning occurs when a broker, motivated by the desire to earn successive commissions, encourages a consumer to refinance a loan shortly after the closing of the original loan. The EPO attempts to curb this practice by establishing that if a loan is paid off within six months of closing per the terms of the Broker Agreement, the broker is required to refund its commissions to UWM (the "6-month EPO").

In 2020, UWM became concerned the EPO period was not effectively curbing the potential for churning. It noticed a tiny of its independent brokers were refinancing loans three to five times faster than industry standards. On March 12, 2020, in accordance with the Broker Agreement, UWM notified these suspect brokers it was modifying the EPO provision in their Broker Agreements from six

---

[1] On December 14, 2020, Defendant United Shore Financial Services LLC changed its name to United Wholesale Mortgage, LLC.

months to twelve months (the "12-month EPO"). Going forward, brokers subject to the 12-month EPO were required to refund commissions on any loans they originated that the consumer paid off within 12 months of closing. As independent brokers, they had no obligation to continue to do business with UWM or to accept this revised term. By electing to submit new loans to UWM, many brokers accepted the 12-month EPO. UWM further assured brokers it would continue to monitor loan payoff speeds for each individual broker, and if their speed of refinancing slowed down to acceptable levels, UWM would remove the 12-month EPO contractual requirement.

UWM's contractual change worked to stop churning. Only 74 brokers repaid any commissions pursuant to the 12-month EPO (the "Affected Brokers"). By June of 2020, more than half of the Affected Brokers were removed from the 12-month EPO requirement and returned to the 6-month EPO. As of today, only seven brokers remain on the 12-month EPO.

Plaintiffs filed this matter claiming that UWM breached its contract by retroactively issuing invoices for loans that violated the 12-month EPO. UWM's change to a 12-month EPO was in full compliance with the Broker Agreement. The Court need not reach the merits because the Plaintiffs' jurisdictional allegations are infirm. The Complaint asserts subject matter jurisdiction on the sole basis of the Class Action Fairness Act ("CAFA"). However, CAFA requires *both* that there be

at least 100 members of the putative class and the aggregate amount-in-controversy exceed $5 million. Plaintiffs meet neither factor. There are fewer than 100 putative class members who can claim any alleged monetary damages caused by the contractual change, even assuming they prove the merit of their claims.

Here, Plaintiffs named not only the independent brokerage companies as named plaintiffs, but also included the individuals who are the owners of the three brokerages. The individuals have no stake in this case and were included as plaintiffs to make it appear there are more putative class members than there really are. These individuals have no standing to assert any claims because they are not parties to any contract with UWM. For this reason, the claims of these individuals should also be dismissed pursuant to Fed. R. Civ. P. 12(b)(6), and they do not count towards CAFA's requirement of 100 class members.

Plaintiffs also cannot meet the amount-in-controversy requirements of CAFA. The only economic harm suffered by the putative class are those commissions UWM actually recouped from loans that violated the 12-month EPO provision. The aggregate amount of commissions repaid under the new 12-month provision by putative class members is less than $1 million … a far cry from CAFA's $5 million amount-in-controversy requirement. While UWM issued invoices seeking repayment of commissions on loans that violated the 12-month EPO, a mere assertion by UWM that certain brokers are required to repay commissions does not

3

constitute actual damages. Further, any damage resulting from those invoices is purely conjectural, as UWM waived repayment in many instances, and it has not undertaken litigation to enforce any invoice. Accordingly, as Plaintiffs do not meet two of CAFA's requirements, this matter should be dismissed for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).

## **FACTUAL BACKGROUND**

### A.   **The Contracts Between UWM and the Independent Mortgage Brokers.**

UWM is a wholesale mortgage lender that underwrites and funds mortgage loans originated by its independent mortgage broker clients. (Ex. 1, Plotnik Aff. ¶ 2.) UWM has approximately 11,000 clients nationwide. (*Id.* ¶ 11.)

There are six named Plaintiffs in this action, three of whom are independent mortgage brokers: Plaintiffs First Plus Funding, Inc. ("First Plus"), First Allied Financial Services, Inc. ("First Allied"), and Reliance Mortgage Service ("Reliance") (collectively, the "Company Plaintiffs"). (ECF No. 1, Compl. ¶¶ 5, 7, 9.) The remaining three Plaintiffs (Bhasin, James, and Otero) are alleged to be the "principal officer[s] and sole owner[s]" of the Company Plaintiffs and are collectively referred to herein as the "Individual Plaintiffs." (*Id.* ¶¶ 4, 6, 8.)

The basis of the Complaint is a form contract UWM enters into with independent mortgage brokers, the "Broker Agreement." Plaintiffs attached an

4

example of the Broker Agreement to their Complaint as Exhibit A.[2] (Compl. ¶¶ 15, 27, 68 and Ex. A.)

Pursuant to the Broker Agreement, independent mortgage brokers are paid commissions for originating loans closed through UWM. (Compl. ¶¶ 2, 16; *id.* Ex. A, § 2.04.) The Broker Agreement includes an "Early Payoffs" provision to deter independent mortgage brokers from churning consumers' loans. The EPO reduces the incentive for brokers to obtain multiple commissions from a single consumer by convincing that consumer to quickly refinance their loan. The 6-month EPO contained in the Broker Agreement provides:

> UWM is committed to the long-term performance of its loans. As such, should any Mortgage Loan delivered hereunder be paid off within one hundred eighty (180) days of the funding of such Mortgage Loan for any reason, Broker shall promptly deliver to UWM the greater of: (a) any credit for the rate paid by UWM to the borrower or Broker, in the aggregate; or (b) one (1%) percent of the amount of the Mortgage Loan." (Compl. ¶ 17; Ex. A at § 7.17.)

In sum, the 6-month EPO obligates a broker to return "commissions" paid by UWM if a loan is paid off within six months of closing. (Ex. 1, ¶ 8.)[3] The Complaint does

---

[2] Plaintiffs allege that Exhibit A is an example of the form contract UWM enters into with independent mortgage brokers. (Compl. ¶ 15.) For the purposes of this Motion, UWM accepts this allegation as true, but notes that the name of the Agreement is the "Wholesale Broker Agreement." (Ex. A.)

[3] As used herein, the term "commissions" refers to the amounts that the broker is obligated to refund to UWM if there is an early payoff under an EPO.

not allege there is anything wrong with the 6-month EPO, and it should be noted that the 6-month EPO is a very standard provision within the lending industry.

**B.   UWM Provides Notice to a Limited Number of its Brokers of the New 12-Month EPO Provision.**

UWM learned that a small handful of the approximately 11,000 independent mortgage brokers who originate loans funded by UWM were quickly refinancing loans, a practice which UWM recognized as evidence of potential churning. UWM recognized it needed to act to protect consumers under federal fair lending laws. Therefore, on March 12, 2020, UWM provided a notice via email directly to those brokers which it believed were causing loans to be paid off faster than industry standards. The email included a video that announced UWM was instituting the 12-month EPO, thus lengthening the EPO period from six to twelve months. (Ex. 1, Ex. A, Mar. 12, 2020 email with embedded video link (https://www.uwm.com/epo-policy) and uncertified transcript of the video.) Under the 12-month EPO, if a loan was refinanced within twelve months of the closing of the original loan, the broker was obligated to return the commission paid on the original loan to UWM. (Ex. 1, ¶ 15.) The 12-month EPO only applied to loans refinanced after the notice of the 12-month EPO was issued.

UWM has always enforced the EPO by issuing invoices to brokers to refund commissions for loans that are paid off early. Brokers placed on the 12-month EPO were advised that their invoices would now include commissions on loans that were

6

paid off within twelve months of being closed. (*Id*. ¶ 15.) In the video, UWM noted that it would review each of the brokers' accounts to determine if their rates of refinancing slowed to within industry standards, allowing UWM to remove the broker from the 12-month EPO. (*Id*.) Once removed, the brokers returned to the 6-month EPO. (*Id*. ¶ 16.) As a result of the contractual change to a 12-month EPO, most of the impacted brokers changed their behavior. (*Id*. ¶ 17.) Within three months of UWM's institution of the contract change, more than half of the brokers improved their prepayment speeds and moved back to the 6-month EPO. (*Id*.)

The 12-month EPO does not prevent consumers from refinancing loans or punish brokers for legitimate early payoffs. Accordingly, UWM has waived the 12-month EPO where appropriate, allowing brokers to retain commissions on loans that do not appear to constitute churning or where brokers provided a valid basis for the early refinancing. (*Id*. ¶ 19.) In many instances, UWM also waived EPO payments on invoices if, for example, refinanced loans that closed before March 12, 2020, were identified as subject to the new 12-month EPO provision. (*Id*.) Some waivers are reflected on invoices sent to Plaintiffs. (Ex. 1, at Exs. B, C and D.)

The 12-month EPO is intended to protect consumers from the potential for churning, not to generate revenue. For that reason, UWM never filed a lawsuit to collect commissions which are owed under the 12-month EPO and quickly returned brokers to the 6-month EPO if they reformed their conduct. (Ex. 1, ¶ 20.) UWM did

not institute the 12-month EPO with *all* independent mortgage brokers. It only focused on the limited number of brokers it believed were bad actors and reverted to the 6-month EPO when the 12-month EPO was no longer necessary.

Many independent mortgage brokers accepted the change by continuing to originate loans for funding with UWM. (Ex. 1, ¶ 18.) Under the Broker Agreement, independent mortgage brokers are free to originate their loans for funding with any wholesale mortgage lender, and UWM is free to approve or deny funding for each and every loan application it receives from a broker. *See* Ex. A, § 7.03 ("Broker shall *not* be *obligated to submit any particular mortgage loan applications...*"); § 2.01 ("UWM agrees to *consider* purchasing and/or funding certain Mortgage Loans from Broker …"); *id.* § 2.02 ("Any commitment … will be issued in accordance with UWM's current lending policies and *shall be in UWM's sole and absolute discretion.*"); *id*. § 7.03 ("*Nothing* contained in this Agreement *shall be construed to require UWM to approve, purchase and/or fund any Mortgage Loan* …. Approval and funding of [Mortgage Loans] *shall be in the sole and absolute discretion of UWM….*").[4] Independent mortgage brokers who are clients of UWM may submit as many or as few mortgage loans and loan applications to UWM as they wish. *See id.* § 7.03 ("Broker shall *not* be *obligated to submit … any minimum number* of loan applications to UWM.").

_____

[4] Unless otherwise noted, emphasis is added throughout the brief.

Moreover, under the terms of the Broker Agreement, UWM expressly reserves the right to make amendments thereto, including to the EPO. Because each loan application constitutes a new transaction, independent mortgage brokers consented to these amendments by submitting new loan applications. Indeed, the express terms of the Broker Agreement provide that: "Broker agrees that the submissions of any [mortgage loan] to UWM *after such amendment shall be Broker's agreement to the amendment* without further signature or consent of any kind. Any such amendment shall apply to pending, and/or future Mortgage Loan Applications submitted by Broker." (Ex. A, § 7.08.) Thus, when an independent mortgage broker submits a loan application or loan to UWM, they agree to UWM's terms and conditions. *See id.*

### C. The Jurisdictional Allegations in Plaintiffs' Complaint

#### 1. *The Amount-in-Controversy as Alleged in the Complaint.*

The Complaint does not identify an exact amount-in-controversy, stating instead, *inter alia*, that UWM "improperly charged" or "withheld" commissions from the Plaintiffs, *id.* ¶¶ 32, 38, 44, and that Plaintiffs and the purported class "have suffered, and will continue to suffer in the future, damages under the contracts, plus interest, and other economic damages, for a total amount to be shown at the time of trial." (*Id.* ¶ 73.) Plaintiffs do not provide a dollar figure for damages, collectively or individually. Instead, Plaintiffs allege only that "the combined claims of the

proposed Class Members exceed $5 million," the exact amount required by CAFA. (*Id.* ¶ 11.)

The Complaint does not allege how much UWM allegedly "improperly charged" or "withheld" from Plaintiffs. It does allege that UWM "sent … an invoice" to the three Company Plaintiffs, each of which "declare[d]" that some amount was owed. (*Id.* ¶¶ 30–31, 36–37, 42–43.) First Plus received an invoice for $77,146.37, First Allied received an invoice for $10,449.35, and Reliance received an invoice for "several thousand dollars." (*Id.* ¶¶ 31, 37, 43.) The Complaint does not and cannot allege that UWM has attempted to sue on the invoices; nor does it allege an amount that UWM allegedly wrongfully received or retained. (*See id.* ¶ 70 (unspecified "commissions" were "withh[eld]" or "charged back").)

### 2. *The Number of Putative Class Members.*

The Complaint neither identifies how many brokers UWM allegedly placed under the new 12-month EPO provision nor alleges the number of brokers UWM allegedly damaged because of this contract change. Plaintiffs make only conclusory allegations about the number of brokers impacted by the 12-month EPO. For example, the Complaint alleges that UWM "informed *approximately* 100 contracted brokers in California" of the changed contractual term. (Compl. ¶¶ 3, 22.) It later states, without factual support, that "there are at least 100 members of the putative class," *id.* ¶ 11, and that "[w]hile Plaintiffs are informed and believe that there are

100 members of the class, the precise number of Class members … [is] presently unknown to Plaintiffs, *but may be reasonably ascertained from UWM's records and files.*" (*Id.* ¶ 48.) Plaintiffs also "estimate that the class will include 100 people." (*Id.* ¶ 60.) The Complaint fails to allege any specific facts to support the number of potential class members.

### D.   There are Only 74 Affected Brokers from Whom UWM Received Less Than $1 Million.

Based upon a review of UWM's books and records, as of January 31, 2021, UWM recouped less than $870,000 in the aggregate from the 74 Affected Brokers under its 12-month EPO (Ex. 1, ¶ 25.) These amounts were collected in one of two ways: either the Affected Brokers voluntarily repaid the commissions to UWM, or UWM netted out the amounts owed from loans the Affected Brokers voluntarily submitted for funding by UWM after March 12, 2020. (*Id.*) Of the six named Plaintiffs, only two repaid any commissions to UWM under the 12-month EPO: First Allied repaid $7,360.20 and First Plus repaid $7,273.73. (*Id.* ¶ 26(a), (b); Exs. B, C.) Reliance has not repaid any commissions under the 12-month EPO. (Ex. 1, ¶ 26(c), Ex. D.) Only seven Affected Brokers remain subject to the 12-month EPO. (Ex. 1, ¶ 27.)

## **ARGUMENT**

## I.    **THIS COURT LACKS SUBJECT MATTER JURISDICTION.**

### A.    **Standard of Review**

"A motion to dismiss pursuant to [Fed. R. Civ. P.] 12(b)(1) may either attack the claim of jurisdiction on its face or it can attack the factual basis of jurisdiction." *Golden v. Gorno Bros.*, 410 F.3d 879, 881 (6th Cir. 2005). When a Rule 12(b)(1) motion attacks the factual basis for jurisdiction, "the district court must weigh the evidence and the plaintiff has the burden of proving" that the court has subject matter jurisdiction. *Id.* (citing *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004)). In a factual attack, the court will "weigh the evidence concerning jurisdiction presented by the parties and decide the jurisdictional facts." *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1135 (6th Cir. 1996). "[N]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *RMI Titanium*, 78 F.3d at 1135 (emphasis omitted).

The Rule 12(b)(1) portion of this Motion is a factual attack on subject matter jurisdiction. Thus, the Court should weigh the evidence both attached to and incorporated in the Complaint, as well as the additional evidence that UWM submitted in support of this Motion.

12

### B.    Plaintiffs Lack Subject Matter Jurisdiction Under CAFA.

UWM seeks dismissal of Plaintiffs' Complaint for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). Even assuming Plaintiffs' allegations are true for the purposes of this Motion only, it is a legal certainty that subject matter jurisdiction under CAFA, 28 USC § 1332(d), does not exist. "CAFA gives federal courts jurisdiction over certain class actions, defined in § 1332(d)(1), if the class has more than 100 members, the parties are minimally diverse, and the amount in controversy exceeds $5 million." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 84–85 (2014). While Plaintiffs allege the requirements of CAFA by parroting its language, they cannot meet two of its three requirements. First, the putative class does not exceed 100 members. UWM recouped commissions from only 74 independent mortgage brokers under the 12-month EPO. Second, the amount-in-controversy does not rise to the required $5 million minimum threshold. UWM collected an aggregate of less than $870,000 in recouped commissions under the 12-month EPO. This is not even close to the required $5 million. Because Plaintiffs cannot establish either of these two CAFA requirements, this action should be dismissed.

### 1.    *The Amount-in-Controversy is less than $5 Million.*

The general rule for determining the amount-in-controversy is to look to the amount alleged in the complaint. However, the Court should ignore such allegations

where "it appears or is in some way shown that the amount in the complaint is not claimed 'in good faith.'" *Alinsub v. T-Mobile*, 414 F. Supp. 2d 825, 827–28 (W.D. Tenn. 2006) (quoting *Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 353 (1961)). In performing that analysis, "it must appear to a legal certainty that the claim is really for less than the jurisdictional amount." *Blaszczyk v. Darby*, 425 F. Supp. 3d 841, 852 (E.D. Mich. 2019), *appeal dismissed*, 2020 WL 3470326 (6th Cir. June 3, 2020) (quoting *Charvat v. GVN Mich., Inc.*, 561 F.3d 623, 628 (6th Cir. 2009)). (*See* Ex. 2, containing all unpublished cases.)

> ### a. The putative class is made whole for less than $1 million.

In this contract action, the amount-in-controversy stems from any damage Plaintiffs allegedly suffered from UWM's alleged breach of the Broker Agreement. "Damages are an element of a breach of contract claim, and if there are no damages, then there can be no breach of contract action." *Consol. Rail Corp. v. Grand Trunk W. R. Co.*, 853 F. Supp. 2d 666, 670 (E.D. Mich. 2012). "[T]he appropriate remedy for a breach of contract is 'to make compensation adequate to the real injury sustained, and to place the injured party, so far as money can do it, in the same position he would have occupied if the contract had been fulfilled.'" *Ambler v. Thompson*, No. 325042, 2016 WL 1243425, at *2 (Mich. Ct. App. Mar. 29, 2016) (quoting *Hammond v. Hannin*, 21 Mich. 374, 384 (1870)). "In addition, a breach of contract claim must be rejected where the breach, if any, is '*damnum absque*

14

*injuria*'"—damages without an injury. *Hendricks v. DSW Shoe Warehouse, Inc.*, 444 F. Supp. 2d 775, 780 (W.D. Mich. 2006) (quoting *United States v. Cnty. of Muskegon*, 298 F.3d 569, 585 (6th Cir. 2002)).

In this action, the damages which "arise naturally from the [alleged] breach" are not the amounts invoiced, but the amounts UWM allegedly recouped from the Affected Brokers. *Hendricks*, 444 F. Supp. 2d at 780. UWM has not enforced or acted to enforce anywhere near the amounts set forth in the invoices sent to Plaintiffs. In fact, most of the independent mortgage brokers placed on the 12-month EPO have retained the bulk of the commissions identified on monthly invoices sent to them. (Ex. 1, ¶ 22.) Plaintiffs cannot dispute that UWM did not recoup *all* of the commissions stated on the invoices. While First Plus alleges that UWM sent it an invoice for $77,146.37, Compl. ¶ 31, First Plus has retained all but $7,273.73 of those commissions. (Ex. 1, ¶ 26(b).) Even if Plaintiffs are entirely successful, First Plus would still only be entitled to recover $7,273.73. The same is true of First Allied, which can recover only $7,360.20 recouped by UWM. (*Id.* ¶ 26(a).) Reliance would recover *nothing*, as it still possesses every UWM commission it was paid. (*Id.* ¶ 26(c).) The only potentially recoverable damages are those amounts UWM allegedly and involuntarily recouped from the Affected Brokers, which amounts are significantly below the jurisdictional requirements for a class action under CAFA.

Thus, while the parties dispute liability, and may ultimately dispute the

amount of damages, it is a legal certainty that the aggregated amount that the putative class members could recover will in no event be greater than $1 million. Further, there is no possibility that further damages could accrue. UWM recoups commissions paid on loans that violate the 12-month EPO from subsequent loans originated by brokers for funding by UWM or from voluntary payments. Yet, the named Plaintiffs and UWM have terminated their relationship. (*Id.* ¶ 24.) Therefore, there is no possibility that the unpaid commissions will be recouped. (*Id.*) Additionally, only seven brokers are still subject to the 12-month EPO, and there is no dispute over the applicability of the 6-month EPO. (*Id.* ¶ 27.) Plaintiffs' potentially available damages are well short of the $5 million jurisdictional limit. As a result, there is no jurisdiction under CAFA.

> **b.** **Even if this Court factored in reasonable attorneys' fees, Plaintiffs could not reach the jurisdictional limit.**

Plaintiffs' request for contractual attorneys' fees is also insufficient to satisfy CAFA's $5 million amount-in-controversy requirement. The Sixth Circuit requires any estimated fees added to the amount-in-controversy to be reasonable. They also hold that what constitutes a "reasonable" fee (as a percentage of the possible recovery) decreases as the size of that possible recovery goes up. To illustrate, in *Public Funding Corp. v. Lawrence County Fiscal Court*, 1989 WL 153970, at *2 (6th Cir. Dec. 21, 1989), the Sixth Circuit noted that while a $500 fee might be a reasonable estimate for a $1,000 case, or $5,000 fee might be a reasonable estimate

for a $10,000 case, a $500,000 fee might not be a reasonable estimate for a $1,000,000 case. *See also Petterman v. Haverhill Farms, Inc.,* 125 Mich. App. 30, 32 (1983) (citing *Wood v. DAIIE*, 413 Mich. 573 (1982)) (establishing factors which should be considered by a trial court when considering the reasonableness of attorneys' fees, including "the amount in question and the results achieved," and holding that "even a superficial application of [these] factors raises questions as to the reasonableness of the attorney fees award: the $9,304 fee was charged for a claim evaluated at $12,500….").

Here, there is no realistic possibility that reasonable attorneys' fees could sufficiently boost the amount-in-controversy to more than $5 million. Plaintiffs' contractual damages leave them more than $4 million short of CAFA's $5 million requirement. Plaintiffs' would need to receive an entirely implausible fee award of $4 million—more than quadrupling their alleged damages—for $5 million to be in controversy.

## c. The declaratory judgment claim places the same insufficient amount-in-controversy as the breach of contract claim.

Plaintiffs' claim for declaratory relief does not create subject matter jurisdiction. "In actions seeking declaratory … relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." *Freeland v. Liberty Mut. Fire Ins. Co.*, 632 F.3d 250, 253 (6th Cir. 2011) (quoting

17

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977)). Here, Plaintiffs' declaratory judgment count seeks no more than their breach of contract claim: a declaration of rights and obligations related to UWM's alleged decision to "withhold[] payment, or demand[] repayment, of amounts due under" the Broker Agreement. (Compl. ¶¶ 76–78.) As the breach of contract claim fails to meet the jurisdictional limit, so too must the declaratory judgment action.

Moreover, when determining whether to exercise jurisdiction over a declaratory judgment action, a court considers five factors, the most important here being "whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue" and "whether there is an alternative remedy that is better or more effective." *Nationwide Affordable Hous. Fund 27, LLC v. Urban 2004 Holding Co.*, No. 2:20-CV-1762, 2020 WL 3642575, at *2 (S.D. Ohio July 6, 2020) (quoting *Zide Sport Shop of Ohio, Inc. v. Ed Tobergte Assocs., Inc.*, 16 Fed. App'x. 433, 438 (6th Cir. 2001)).

Here, there is not a live controversy, as the contractual relationship ended between UWM and the named Plaintiffs, and the vast majority of the putative class is no longer subject to the 12-month EPO. (Ex. 1, ¶¶ 24, 17.) Moreover, Plaintiffs' rights are fully protected by their breach of contract claim. As in *Nationwide*, this case involves past alleged wrongs in a terminated relationship and, therefore, a

18

declaratory judgment would not serve a useful purpose. *Nationwide*, 2020 WL 3642575, at \*4.

### 2.    *Plaintiffs Cannot Point to 100 Putative Class Members.*

Plaintiffs also cannot obtain this Court's jurisdiction because there are fewer than 100 putative class members. CAFA does not permit a court to take jurisdiction where "the number of members of all proposed plaintiff classes in the aggregate is less than 100." 28 U.S.C. §1332(d)(5)(B).

It is well-established that while class members need not make individual showings of Article III standing, it must be reasonably clear that all proposed class members suffered an injury in fact. *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2nd Cir. 2006) ("At the same time, no class may be certified that contains members lacking Article III standing…. The class must therefore be defined in such a way that anyone within it would have standing."); *Chaz Concrete Co., LLC v. Codell*, No. CIV A 3:03–52–KKC, 2006 WL 2453302, at \*6 (E.D. Ky. Aug. 23, 2006) ("A properly defined class includes only members who would have standing to bring suit in their own right.").

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560

(1992)). "A 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Spokeo*, 136 S. Ct. at 1548 (citing Black's Law Dictionary 479 (9th ed. 2009)). The plaintiff bears the burden of demonstrating Article III standing. *Spokeo*, 136 S. Ct. at 1547. The Sixth Circuit has found, for example, that a plaintiff lacked standing where the defendant's act "could not financially harm" the plaintiff and where that act, if "revers[ed] could not provide [the plaintiff] with one cent more" than they would have had otherwise. *In re Capital Contracting Co.*, 924 F.3d 890, 897 (6th Cir. 2019) (plaintiff law firm lacked standing to object to bankruptcy trustee's final report where the law firm had voluntarily withdrawn its attorneys' fee claim as part of settlement over a malpractice claim); *see also Spokeo*, 136 S. Ct. at 1549 (although disseminating an incorrect zip code in a credit report may be a technical violation of the Fair Credit Reporting Act, a plaintiff likely could not bring such a suit in federal court because they would not have suffered any concrete harm).

Here, Plaintiffs define the class as "[a]ll Brokers who contracted with UWM under the Wholesale Lending Agreement (or similar agreement) and whose commissions *were withheld or who were invoiced for commissions* on loans that were paid off over 180 days after funding by UWM." (Compl. ¶ 45.) However, as discussed above, only class members that had commissions "withheld" are potentially damaged. Class members without damages do not have Article III standing. As they have no injury in fact, they have no standing and are not members

of any proposed class. UWM has only received or "withheld" commissions from 74 brokerage companies nationwide. (Ex. 1, ¶ 22.) Thus, there are only 74 brokerage companies that have been allegedly harmed by the 12-month EPO. The standing doctrine therefore limits the putative class to, at most, these 74 members.

Knowing they cannot meet the jurisdictional minimum, Plaintiffs arbitrarily added the Company Plaintiffs' owners as parties to this case to make the class appear larger than it really is. *Accord Mitan v. Int'l Fid. Ins. Co.*, 23 F. App'x 292, 297 (6th Cir. 2001) ("Dismissal for failure to satisfy the requisite jurisdictional amount may be appropriate when the facts indicate that a plaintiff claimed certain damages merely to obtain federal court jurisdiction."). The parties to the exemplary Broker Agreement attached to the Complaint are First Plus and UWM. (Compl. Ex. A.) Plaintiffs do not allege any Individual Plaintiff is a party to any Broker Agreement. The Individual Plaintiffs have no personal interest in this action and lack standing. The Court should therefore, as shown below, dismiss them from this case and not count them toward the 100 class members requirement.

## II.  THE INDIVIDUAL PLAINTIFFS SHOULD ALSO BE DISMISSED.

UWM also moves, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the three Individual Plaintiffs for failure to state a claim upon which relief can be granted. A court should grant a motion to dismiss for failure to state a claim upon which relief can be granted when, "in considering 'all well-pleaded allegations in the complaint

as true ... it appears beyond doubt that the plaintiff can prove no set of facts in support of its claims that would entitle it to relief.'" *Kostrzewa v. City of Troy*, 247 F.3d 633, 638 (6th Cir. 2001). "In ruling on a motion to dismiss, the Court may consider the complaint as well as (1) documents that are referenced in the plaintiff's complaint and that are central to plaintiff's claims ...." *ZMC Pharmacy, LLC v. State Farm Mut. Auto. Ins. Co.*, 307 F. Supp. 3d 661, 669 (E.D. Mich. 2018).

It is black-letter law that a claim for breach of contract fails when the plaintiff and the defendant have not entered into a contract with each other. *Burton v. William Beaumont Hosp.*, 373 F. Supp. 2d 707, 718 (E.D. Mich. 2005) ("Under Michigan law, the elements of a breach of contract claim are: (1) the existence of a contract between the parties ..."). Moreover, "only the parties to the agreement and those third parties that the contracting parties intended to benefit by the agreement may sue to enforce it." *Bailey v. Schaaf*, 304 Mich. App. 324, 332, *appeal denied*, 497 Mich. 927 (2014) (citations omitted).

Here, none of the Individual Plaintiffs allege they entered into a contract with UWM. Rather, the Complaint uniformly alleges the Company Plaintiffs entered into the Agreement. (Compl. ¶¶ 27, 33, 39.) The contract attached as Exhibit A to the Complaint confirms the Individual Plaintiffs were not parties to the contract. (*See also* Ex. 1, ¶ 5.) The Individual Plaintiffs are also not third-party beneficiaries. (Ex. A, § 7.21).

The same is true for any declaratory relief based on the existence of a contract. *See Defiance Hosp. v. Fauster-Cameron, Inc.*, 344 F. Supp. 2d 1097, 1118 (N.D. Ohio 2004). "Because plaintiffs lack standing to sue to enforce or void the … contracts," their declaratory judgment count "must fail as a matter of law." *Id*.

The Individual Plaintiffs do not allege, and cannot truthfully state, they are a party to any Broker Agreement. This fact is fatal to both of their claims. Accordingly, this Court should dismiss the Individual Plaintiffs for failure to state a claim.

## **CONCLUSION**

UWM amended its early payoff provision for a tiny fraction of the brokers it does business with because they were suspected of churning loans. UWM made this contractual change to protect consumers. Within months of this contractual amendment, the vast majority of affected brokers changed their behavior and were returned to the 6-month EPO. UWM acted in accordance with its contractual rights under the Broker Agreement. Simply put, UWM did nothing wrong.

Even assuming for the purpose of this jurisdictional motion only that Plaintiffs' claims have merit, Plaintiffs still cannot establish CAFA jurisdiction. UWM's books and records establish that under the 12-month EPO only 74 brokers were potentially harmed through recoupment of commissions. UWM also collected far less than the required $5 million in recouping commissions under the 12-month EPO.

WHEREFORE, for all the above reasons, Defendant respectfully requests that this Court grant its Motion and any other relief the Court deems necessary and just.

Respectfully submitted,

By: */s/ E. Powell Miller*
E. Powell Miller (P39487)
Kevin F. O'Shea (P40586)
Ann L. Miller (P43578)
The Miller Law Firm, P.C.
950 W. University Drive, Ste. 300
Rochester, MI 48307
248-841-2200
epm@millerlawpc.com
kfo@millerlawpc.com
alm@millerlawpc.com

Dated: October 14, 2014

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 14, 2021, I electronically filed the foregoing document using the ECF system which will send notification of such filing to all attorneys of record.

Respectfully submitted,

By:  */s/ E. Powell Miller*
E. Powell Miller (P39487)
Kevin F. O'Shea (P40586)
Ann L. Miller (P43578)
The Miller Law Firm, P.C.
950 W. University Drive, Ste. 300
Rochester, MI 48307
248-841-2200
epm@millerlawpc.com
kfo@millerlawpc.com
alm@millerlawpc.com