UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| RISHI BHASIN, ANNE JAMES, NELSON OTERO, FIRST PLUS FUNDING, INC., FIRST ALLIED FINANCIAL SERVICES, INC., and RELIANCE MORTGAGE SERVICE, on behalf of themselves and all others similarly situated, | Case No. 20-13278 Honorable Laurie J. Michelson |
| Plaintiffs, | |
| v. | |
| UNITED SHORE FINANCIAL SERVICES, LLC d/b/a UNITED WHOLESALE MORTGAGE, | |
| Defendant. | |

## OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART DEFENDANT'S
## FIRST AND SECOND MOTIONS TO DISMISS [23] [24]

This is a contract dispute between about 100 mortgage brokers and a wholesale mortgage company, United Shore Financial Services, LLC, d/b/a United Wholesale Mortgage (UWM). And it is a narrow one. The brokers each entered into a form contract with UWM that said that UWM would underwrite mortgages for the brokers' clients and, in exchange, pay the brokers' commissions. In March 2020, UWM unilaterally amended a term of the agreement, which the brokers agree they could do. But then UWM applied that new term retroactively, which

the brokers argue they could not do. Then UWM began invoicing the brokers and withholding commissions based on the retroactive application of that new term. So the brokers filed suit seeking damages and declaratory relief, as well as class certification under the Class Action Fairness Act (CAFA).

UWM has filed two motions to dismiss, asking this court to dismiss for lack of subject-matter jurisdiction and for failure to state a claim. Because the brokers have properly alleged CAFA jurisdiction and because they have stated a claim under Rule 12(b)(6), the Court will DENY IN PART the motions to dismiss. However, because the brokers have no objection to the dismissal of the individually named plaintiffs (as opposed to the brokerage companies who executed contracts with UWM), those individuals are dismissed, and the first motion is thus GRANTED IN PART.

## I. Background

Plaintiffs are six independent mortgage brokers—some private individual brokers, some brokerage companies—who seek to represent a class of similarly-situated persons. (ECF No. 1.) Attaching a form Wholesale Broker Agreement to the complaint (ECF No. 1-1), the brokers explain that UWM would underwrite mortgages for the brokers' clients and, in return, pay the brokers' commissions. (ECF No. 1, PageID.6; ECF No. 1-1, PageID.27.)

Before preceding to the dispute, it is helpful to outline the Wholesale Broker Agreement. (*See* ECF No. 1-1.) Four provisions are relevant to this opinion. The first is an "early payoff" clause (EPO). (*Id.* at PageID.34.) UWM explains that the

EPO seeks to prevent "churn" by "reduc[ing] the incentive for brokers to obtain multiple commissions from a single consumer by convincing that consumer to quickly refinance their loan." (ECF No. 23, PageID.359.) To that end, the EPO requires brokers to repay UWM for any commissions on mortgages that are refinanced by their clients within six months of the loan's funding date. (ECF No. 1-1, PageID.34.) The second two clauses pertain to contract modification. (*Id.* at PageID.33.) The first of these says: "7.01. Amendment of Agreement. Except as set forth on Section 7.08, this Agreement may not be amended except in writing executed by authorized representatives of both Broker and UWM." (*Id.*) And section 7.08 gives UWM the power to unilaterally amend the contract under certain conditions. (*Id.*) Specifically, the agreement says that "the submission of any Mortgage Loan Applications . . . to UWM after such amendment shall be Broker's agreement to the amendment without further signature or consent of any kind. Any such amendment shall apply to pending, and/or future Mortgage Loan Applications submitted by Broker." (*Id.*) And finally, the agreement provides reasonable attorney fees and costs to the prevailing party in any legal action. (*Id.* at PageID.34.)

On to the dispute. UWM unilaterally changed the terms of the EPO on March 12, 2020. (ECF No. 23, PageID.360; ECF No. 10, PageID.187; ECF No. 13, PageID.280; *but cf.* ECF No. 1, PageID.8 (suggesting the date was March 17, 2020).) On that date, it sent approximately 100 brokers an email explaining that they would now have to repay commissions on any loans that were refinanced by

3

their clients within 12 months of the funding date, rather than the standard six months. (ECF No. 23, PageID.360 (citing United Wholesale Mortgage, "EPO POLICY CHANGE FOR 100 CLIENTS," https://perma.cc/5GB5-ZQAY).) And a video attached to the email informed the affected brokers that UWM planned to apply the 12-month EPO retroactively. (*See id.* at 1:30.) Shortly thereafter, UWM began sending invoices to the brokers demanding repayment of commissions for already-closed loans under the new EPO and withholding commissions from unrelated transactions (i.e., new mortgage loans) to recoup the disputed funds. (ECF No. 1, PageID.10–14.)

The only dispute in this case is the retroactive application of the 12-month EPO. (ECF No. 10, PageID.188 n.3; ECF No. 12, PageID.260.) In particular, the brokers say that UWM did not have the power to retroactively apply that new EPO to already closed and funded loans. (ECF No. 1, PageID.9.) So in their view, UWM breached the contract when it withheld or tried to recoup commissions on loans that were (1) *closed and funded* before March 12, 2020—the day the email was sent—and (2) refinanced in more than six months but less than 12 months after the funding date. (*Id.*) UWM offers two different views of the retroactivity of the EPO. In the video, UWM suggested that the 12-month EPO applied to any loan closed after March 12, 2019. (ECF No. 23, PageID.360 (citing United Wholesale Mortgage, "EPO POLICY CHANGE FOR 100 CLIENTS," https://perma.cc/5GB5-ZQAY) (video at 1:30).) But in its briefs, UWM says the

"12-month EPO only applied to loans refinanced after UWM provided notice of the 12-month EPO amendment."[1] (ECF No. 24, PageID.484.)

Unable to resolve their differences, the brokers filed suit for breach of contract and declaratory relief in December 2020. (*See* ECF No. 1, PageID.20–23.) Specifically, they seek damages and a declaration that "UWM's amendment of the 'Early Payoffs' provision of their contract does not apply to loans that had been closed and funded prior to the proposed amendment." (ECF No. 1, PageID.22–23.) And they seek class certification under CAFA for "[a]ll Brokers who contracted with UWM under the Wholesale Lending Agreement (or similar agreement) and whose commissions were withheld or who were invoiced for commissions on loans that were paid off over 180 days after funding by UWM." (ECF No. 1, PageID.14.)

In time, UWM filed a motion to dismiss, making two primary arguments. (ECF No. 7.) First, under Rule 12(b)(1), it argues that the brokers cannot meet the requisite $5 million amount in controversy or the minimum class of 100 plaintiffs necessary to establish federal subject-matter jurisdiction under CAFA, 28 U.S.C. § 1332(d). (*Id.* at PageID.70–78.) Second, under Rule 12(b)(6), they argue that the

---

[1] To illustrate the difference between UWM's two positions, consider a loan closed on April 1, 2019 (eleven months before the email was sent) and refinanced on December 1, 2019 (three months before the email was sent and eight months after the loan was closed and funded). The video suggests that UWM could recoup this commission because the loan closed after March 12, 2019. But UWM's briefs suggest that it could not recoup this commission because this loan was refinanced before the email was sent on March 12, 2020. But the brokers believe that UWM could not take either position because recouping any loan closed prior to March 12, 2020 which was refinanced more than six months after it was funded is an impermissible retroactive amendment that breaches the contract.

5

individual plaintiffs (as opposed to the brokerage companies who actually executed contracts with UWM) cannot state a plausible claim for relief because they were not parties to or beneficiaries of the contract on which they base their claims. (*Id.* at 78–80.)

UWM also filed a second motion to dismiss. This motion raises a third, separate argument under Rule 12(b)(6): that some brokers cannot state a plausible claim for relief because the broker agreement allowed UWM to amend terms unilaterally, and the brokers accepted that amendment by continuing to submit loans to UWM. (ECF No. 11.)

Shortly thereafter, the Court ordered UWM to show cause as to "why the Court should not dismiss the First Motion to Dismiss as superseded by the second or the Second Motion to Dismiss as improper [under Federal Rule of Civil Procedure 12(g)] in light of the first." (ECF No. 14, PageID.285.) In its response, UWM explained that the second motion to dismiss should be permitted because it "expressly addresses [the Court's] lack of subject matter jurisdiction," among other reasons. (ECF No. 16, PageID.302.) The Court ultimately permitted the second motion. (ECF No. 17, PageID.322.)

UWM later withdrew its motions to dismiss while the parties attempted to resolve their differences (ECF No. 19), but ultimately refiled them (ECF Nos. 23, 24). Both motions are, again, fully briefed. (ECF Nos. 25 (incorporating by reference ECF Nos. 10, 13), 12, 15, 30.) The parties have provided extensive

briefing that enables resolution of the motion without the need for further argument. *See* E.D. Mich. LR 7.1(f).

## II. Subject-Matter Jurisdiction

The Court begins, as it must, with UWM's attack on its subject-matter jurisdiction. *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007) ("Subject matter jurisdiction is always a threshold determination.").

### A. 12(b)(1) Standard of Review

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) "may either attack the claim of jurisdiction on its face or it can attack the factual basis of jurisdiction." *Crugher v. Prelesnik*, 761 F.3d 610, 613 (6th Cir. 2014) (citing *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005)). A facial attack tests the pleading's sufficiency, not the veracity of its allegations. *Stout v. United States*, 721 F. App'x 462, 465 (6th Cir. 2018). But a factual challenge, as here, requires the district court to "weigh the evidence and the plaintiff has the burden of proving that the court has jurisdiction over the subject matter." (ECF No. 23, PageID.366); *Bowers v. Wynne*, 615 F.3d 455, 457 (6th Cir. 2010) (citing *Golden*, 410 F.3d at 887). In such a case, the "court has broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings, and has the power to weigh the evidence and determine the effect of that evidence on the court's authority to hear the case." *Cartwright v. Garner*, 751 F.3d 752, 759–60 (6th Cir. 2014) (citing *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994)).

**B. Analysis**

CAFA grants federal subject-matter jurisdiction over class actions where the amount in controversy is greater than $5 million, the class has at least 100 members, and the parties are minimally diverse. *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 84–85 (2014); *see also* 28 U.S.C. § 1332(d). There is no dispute that the parties here are minimally diverse. (*See* ECF No. 1, PageID.3; ECF No. 23, PageID.367).

But UWM argues the brokers cannot claim federal jurisdiction under CAFA because (1) fewer than 100 brokers were impacted by the 12-month EPO, and (2) the total damages are less than $5 million in the aggregate. (ECF No. 23, PageID.367.) The Court will take each in turn.

**1. The Size of the Proposed Class**

CAFA requires that the "number of members of all proposed plaintiff classes in the aggregate" be at least 100. 28 U.S.C. § 1332(d)(5)(B). The brokers define their class as "[a]ll Brokers who contracted with UWM under the Wholesale Broker Agreement (or similar agreement) and whose commissions were withheld or who were invoiced for commissions on loans that were paid off over 180 days after funding by UWM." (ECF No. 1, PageID.14.) The brokers allege, and the video suggests, that 100 members of the class received the email. (ECF No. 1, PageID.15; ECF No. 23, PageID.360 (citing United Wholesale Mortgage, "EPO POLICY CHANGE FOR 100 CLIENTS," https://perma.cc/5GB5-ZQAY (video attached to email)).) And UWM admits that 74 brokers in the proposed class

repaid commissions or had commissions withheld, though it never says how many brokers were invoiced but never made payment. (*See* ECF No. 23, PageID.356.)

UWM makes three arguments that the class cannot reach 100 members; none persuade. UWM first argues that the members of the proposed class who retain all of the disputed funds after receiving an invoice lack standing because they have not suffered a concrete injury in fact. (ECF No. 23, PageID.375.) But because UWM fails to consider what form of relief these members of the proposed class seek, the Court disagrees.

"A plaintiff must demonstrate standing for each claim [they] seek[] to press and for each form of relief [they] seek[]." *Glennborough Homeowners Ass'n v. United States Postal Serv.*, 21 F.4th 410, 414 (6th Cir. 2021) (citing *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021)). In order to establish standing to sue, the brokers must demonstrate, among other things, that they have suffered a concrete injury in fact. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To qualify as concrete, the brokers must show that they have "sustained or [are] immediately in danger of sustaining some direct injury as the result of the challenged . . . conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983) (cited by *Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, 927 F.3d 396, 408 (6th Cir. 2019)). The Sixth Circuit has explained that "[t]he distinction between past and ongoing or future harms is significant because the type of harm affects the type of relief available. Past harm allows a plaintiff

to seek damages, but it does not entitle a plaintiff to seek injunctive or declaratory relief. This is because the fact that a harm occurred in the past does nothing to establish a real and immediate threat that it will occur in the future as is required for injunctive [or declaratory] relief." *Kanuszewski*, 927 F.3d at 406.

Given that directive, it is helpful to clarify what relief the proposed class seeks.[2] For the breach-of-contract claim, the brokers request damages. (ECF No. 1, PageID.21–22.) UWM apparently concedes that these brokers have standing to make this claim, and the Court agrees. (ECF No. 23, PageID.375); *see Kanuszewski*, 927 F.3d at 408 ("[T]his is a *completed* harm that only gives the [plaintiffs] standing to pursue damages resulting from this alleged violation.") But for the declaratory judgment claim, the brokers request "a declaration that UWM's amendment of the 'Early Payoffs' provision of their contract does not apply to loans that had been closed and funded prior to the proposed amendment." (*Id.* at 22–23.)

To have standing for the declaratory judgment claim, brokers who retained all of the disputed funds must show that a "yet-to-happen 'injury. . . [is] *certainly impending* to constitute [an] injury in fact.'" *Ass'n of Am. Physicians & Surgeons*

---

[2] For ease of analysis, the Court treats these as two separate groups of proposed class members: those whose "commissions were withheld" and those who "were invoiced for commissions." In reality, many plaintiffs have suffered both types of alleged harm. For example, First Plus Funding, Inc. was invoiced $77,146.37 for disputed commissions in April 2020, but it allegedly repaid UWM only $7,273.73. (ECF No. 23-2, PageID.389, 435.) So, at least in this Court's understanding, First Plus seeks damages of at least $7,273.73 and a declaration that it does not owe UWM the remaining $69,872.64 demanded in the invoice.

*v. United States Food & Drug Admin.*, 13 F.4th 531, 545 (6th Cir. 2021) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). They have done so. For starters, on March 12, 2020, UWM sent out a video saying that they planned to apply the 12-month EPO retroactively. (*See* United Wholesale Mortgage, "EPO POLICY CHANGE FOR 100 CLIENTS," https://perma.cc/5GB5-ZQAY). Second, UWM acted on that email by sending invoices or withholding commissions from unrelated transactions. Third, UWM admits that it has already collected at least $870,000 of disputed commissions from members of the proposed class. (ECF No. 23-2, PageID.388.) And finally, even after the filing of this suit, the most UWM would say on its efforts to collect was that it "has no present intent to sue on any of the EPO invoices." (ECF No. 23-2, PageID.388.) But, as the brokers point out, UWM likely has until 2026 to change its mind under the relevant statute of limitations, leaving them potentially liable for tens of thousands of dollars for the next four years. (ECF No. 10, PageID.200); Mich. Comp. Laws § 600.5807(9). In other words, UWM maintains that it has a right to collect on the invoices, has already collected on the invoices from some class members, and may decide to collect on already-issued invoices at any time in the next four years by withholding funds in unrelated transactions or by filing suit. But the brokers are not required to wait: "[T]he central purpose of the Declaratory Judgment Act . . . is to provide the opportunity to clarify rights and legal relationships without waiting for an adversary to file suit." *Severe Recs., LLC v. Rich*, 658 F.3d 571, 580 (6th Cir. 2011) (citing *Fireman's Fund Ins. Co. v. Ignacio,* 860 F.2d 353, 354 (9th Cir. 1988)). So

the Court finds that this portion of the proposed class has standing to seek a declaratory judgment because the threat of collection on the invoices is real and imminent. *Cf. Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 545 (finding the risk of future harm was speculative because the defendant had not made statements or taken action to harm plaintiffs, plaintiffs could point to no prior enforcement actions, and no warning letters had been sent to plaintiffs).

UWM's reliance on two cases does not alter this conclusion.  First, UWM cites to *In re Capital Contracting Company* to argue that a plaintiff lacks standing "where the defendant's act 'could not financially harm' the plaintiff and where that act, if 'revers[ed] could not provide [the plaintiff] with one cent more' than they would have had otherwise." (ECF No. 23, PageID.374 (quoting 924 F.3d 890, 897 (6th Cir. 2019).) But that case is not persuasive for at least two reasons. First, UWM *can* financially harm the brokers by collecting on the invoices in alleged violation of the Wholesale Broker Agreement. Second, these brokers are not seeking "a cent" from UWM in the form of damages, they merely want a declaration that UWM breached the contract and cannot collect on the invoices. So *In re Capital Contracting Co.* is not relevant.  UWM next relies on *Buchholz v. Meyer Njus Tanick, PA* to suggest that receipt of a demand letter "does not constitute an injury in fact." (ECF No. 15, PageID.291 (citing 946 F.3d 855, 865 (6th Cir. 2020)).). But that case is also distinguishable. Buchholz sued a law firm for sending him a letter that allegedly did not comply with the requirements of the Fair Debt Collections Practices Act. *Id.* at 859–60. But the Sixth Circuit found

that he did not suffer an injury in fact because, "most importantly, Buchholz has not alleged that he refuses to pay what MNT says he owes." *Id.* at 865. In other words, the letter did not change the status quo: Buchholz owed a debt and planned to pay it. So the only injuries he could allege were anxiety and fear of litigation should he fail to pay at some later date. *Id.* at 864–65. Here, in contrast, the brokers deny that they owe the disputed funds and refuse to pay them. *See id.* And given that UWM believes that it has the right to collect on the invoices, that the contract gives UWM the right to sue for breach and to collect attorney fees, that the statute of limitations permits suit until 2026, and that UWM says that it only has no "present intent" to sue, the threat of future injury here is far more concrete.

UWM makes a second argument in support of finding that the class is less than 100 members. In its second motion to dismiss, UWM suggests that the proposed class actually has a maximum of 24 members because all of the other brokers submitted mortgage loan applications after the 12-month EPO amendment was announced, thereby accepting the amendment and barring their claims. (ECF No. 24, PageID.489.) Despite being formally styled as a 12(b)(6) motion, in response to the Court's show cause order, UWM casts its second motion to dismiss as a 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction. (*See* ECF No. 16, PageID.302 ("UWM's Second Motion to Dismiss expressly addresses lack of subject-matter jurisdiction.").) So UWM argues, in essence, that because all but 24 brokers accepted the 12-month EPO by submitting subsequent

mortgages, the class can only contain 24 members. And if the class can only contain 24 members, the Court lacks subject-matter jurisdiction.

But UWM missteps. By arguing that many of the brokers accepted the 12-month EPO, UWM is really asking the Court to examine the merits of the brokers' breach-of-contract claim. And the Sixth Circuit has forbidden such an attack at this stage. Indeed, it has explained that "the district court is prohibited from making factual findings with respect to a jurisdictional issue when such a finding would adversely affect the merits of the plaintiff's case. . . . When 'an attack on subject-matter jurisdiction also implicates an element of the cause of action, then the district court should *find that jurisdiction exists* and deal with the objection as a direct attack on the merits of the plaintiff's claim.'" *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 443–44 (6th Cir. 2012) (emphasis in original) (citing *Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007)). In this case, whether some members of the proposed class have accepted the retroactive application of the 12-month EPO such that they have no claims against UWM impacts more than this Court's jurisdiction. Indeed, such a finding would all but eliminate their breach-of-contract claim. As explained in section IIIB. below, that inquiry would require the Court to determine which provision controls: the Wholesale Broker Agreement's limitation on UWM's power to amend the agreement, or the 12-month EPO term that purports to apply retroactively. So instead of supporting UWM's argument that the Court lacks jurisdiction, this argument suggests that the Court should find jurisdiction and

treat this as an attack on the merits, which it does. And perhaps UWM was aware of this possibility because it correctly labeled the second motion to dismiss as a 12(b)(6) motion and only suggested that this was a jurisdictional argument in response to the Court's show-cause order. (ECF No. 24, PageID.475; ECF No. 16, PageID.301.)

UWM makes one final argument that the class cannot reach 100 members. It argues that the "fatal flaw in Plaintiffs' putative class is punctuated by Plaintiffs' reliance entirely on allegations 'upon information and belief' to satisfy CAFA's jurisdictional requirement of at least 100 class members," and cites *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 570 (2007). (ECF No. 24, PageID.489.) But UWM again misunderstands the standard for a motion to dismiss for lack of subject-matter jurisdiction and seeks instead to apply the standard for a motion to dismiss for failure to state a claim. As explained above, when presented with a factual attack on the Court's subject-matter jurisdiction, the Court "has broad discretion with respect to what evidence to consider in deciding whether subject-matter jurisdiction exists, including evidence outside of the pleadings, and has the power to weigh the evidence and determine the effect of that evidence on the court's authority to hear the case." *Cartwright*, 751 F.3d at 759–60. So the *Twombly* and *Iqbal* standards for 12(b)(6) motions are not applicable. Instead, the Court looks to the complaint and the video UWM provided in its motion to dismiss, which went to 100 brokers, to conclude that the class has 100 members. (ECF No. 1; United

15

Wholesale Mortgage, "EPO POLICY CHANGE FOR 100 CLIENTS," https://perma.cc/5GB5-ZQAY.) While UWM could have provided factual evidence that the Court lacked subject-matter jurisdiction (for example, by showing that only 99 brokers had commissions withheld or were invoiced for disputed transactions under the 12-month EPO), it did not. (*See* ECF Nos. 23, 24.) Instead, it only made the unsuccessful legal arguments addressed above.

In conclusion, given the evidence available, the Court concludes that the proposed class will likely include 100 members, which is sufficient for CAFA jurisdiction. And this is in line with Congress' direction that "in cases in which it is unclear whether 'the number of members of all proposed plaintiff classes in the aggregate is less than 100,' a federal court should err in favor of exercising jurisdiction over the matter." *Shulman v. Chaitman LLP*, 392 F. Supp. 3d 340, 353 (S.D.N.Y. 2019) (citing S. Rep. 109-14, at 42 (2005), 2005 U.S.C.C.A.N. 3, 40.)

### 2. The Amount in Controversy

UWM next challenges the brokers' ability to satisfy the minimum $5 million amount in controversy. In general, when a plaintiff invokes federal-court jurisdiction, "the plaintiff's amount-in-controversy allegation is accepted if made in good faith." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87 (2014). A claim is not made in good faith if the defendant demonstrates "to a legal certainty that the original claim was really for less than the amount-in-controversy requirement." *Schultz v. Gen. R.V. Ctr.*, 512 F.3d 754, 756 (6th Cir. 2008). And CAFA includes additional instructions for calculating the amount in

controversy: "the statute tells the District Court to determine whether it has jurisdiction by adding up the value of the claim of each person who falls within the definition of [the plaintiff's] proposed class and determine whether the resulting sum exceeds $5 million. If so, there is jurisdiction and the court may proceed with the case." *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013) (citing 28 U.S.C. § 1332(d)).

In the complaint, the brokers allege that the combined claims of the class "exceed $5 million." (ECF No. 1, PageID.5.) And in response to UWM's first motion to dismiss, the brokers estimate that the amount in controversy is likely between $8.5 million and $15 million. (ECF No. 10, PageID.203–208.)

To calculate the amount in controversy, the Court considers the amount UWM recouped from the brokers, the value of the declaratory judgment, and attorney fees, which are provided by the contract. *See Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 376 (6th Cir. 2007) ("As a general rule, attorneys' fees are excludable in determining the amount in controversy for purposes of diversity, unless the fees are provided for by contract . . . .") As to the first, UWM admits that it has recouped $870,000. (ECF No. 23, PageID.365.) And, contrary to UWM's suggestion, the value of the declaratory judgment is more than that $870,000. (ECF No. 23, PageID.371.) Instead, as the Sixth Circuit has explained, "[w]here a party seeks a declaratory judgment, 'the amount in controversy is not necessarily the money judgment sought or recovered, but rather the value of the consequences which may result from the litigation' [which is determined] "from the perspective

17

of the plaintiff, with a focus on the economic value of the rights he seeks to protect." *Adelman's Truck Parts Corp. v. Jones Transp.*, 797 F. App'x 997, 1000 (6th Cir. 2020) (citing *Freeland v. Liberty Mut. Fire Ins. Co.*, 632 F.3d 250, 253 (6th Cir. 2011)). In this case, the plaintiffs are seeking to protect their contractual right to commissions on loans that were closed and funded prior to March 12, 2020 and which were not refinanced in six months or less. So the consequence of this litigation would be a declaration that they do not owe UWM those amounts in the invoices. In this case, a conservative estimate of the value of the declaratory judgment is about $4.3 million.[3] So the amount recouped from the brokers and the value of the declaratory judgment exceed $5 million on their own. Additionally, the brokers estimate that there will be $1 million in attorney fees. (ECF No. 10, PageID.207.) Given these figures, the Court concludes that the brokers' amount in controversy was made in good faith and likely exceeds $5 million.

Resisting this conclusion, UWM makes a few unpersuasive arguments. First, UWM argues that "[t]he only potentially recoverable damages are those

---

[3] The brokers suggest that the value of the declaratory judgment is $8.5 million. They reached this figure by averaging the amounts demanded from the three company plaintiffs in just April 2020 and multiplying it by the proposed class size. So ((First Allied: $49,991.32 + Reliance: $29,441.09 + First Plus Funding: $176,719.74) / 3) x 100 = $8,538,405. (ECF No. 10, PageID.203; ECF No. 23-2, PageID.397, 416, 435.) But there are two problems with that calculation. First, the $8.5 million figure did not exclude the amount the brokers already paid to UWM, and which is already accounted for by the $870,000 figure. Second, the amount demanded from First Plus Funding in April 2020 was only $77,146.37, not $176,719.74. So that calculation would actually look something like this: ((First Allied: $49,991.32 + Reliance: $29,441.09 + First Plus Funding: $77,146.37) / 3) x 100 = $5,219,292.67. And $5,219,292.67 - $870,000 (the amount already recouped) = $4,349,292.67.

amounts UWM allegedly and involuntarily recouped from the Affected Brokers, which amounts are significantly below the jurisdictional requirements for a class action under CAFA." But, as explained, the value of the declaratory judgment is "not necessarily the money judgment sought or recovered." *See Jones Transp.*, 797 F. App'x at 1000.

UWM next suggests that those who received invoices but did not pay have only suffered "damages without injury." *See Hendricks v. DSW Shoe Warehouse, Inc.,* 444 F. Supp. 2d 775, 780 (W.D. Mich. 2006). But, again, the brokers who have not made payment on their invoices do not want damages and have suffered a concrete injury in fact sufficient to seek a declaratory judgment, even if they retain all of the disputed funds.

Next, UWM argues that "there is no possibility that further damages could accrue [because] UWM recoups commissions . . . from subsequent loans . . . or from voluntary payments." (ECF No. 23, PageID.370.) And UWM says it cannot withhold commissions from the "named" brokers because they have "terminated their relationship with UWM." (*Id.*) While it is true that UWM has only recouped commissions from voluntary payment or from withholding payment in subsequent transactions to date, it does not follow that the brokers are therefore safe from collection. First, UWM could withhold commissions from unnamed plaintiffs who continue to do business with UWM. And, as the brokers explain, every member of the proposed class remains subject to Michigan's six-year statute of limitations for breach-of-contract claims. (ECF No. 10, PageID.206); Mich. Comp. Laws

19

§ 600.5807(9). And UWM seems to acknowledge this when it said it "has no present intent to sue on any of the EPO invoices," but maintains that it was permitted to apply the 12-month EPO retroactively under the contract. (ECF No. 23-2, PageID.388.)

In conclusion, the Court finds that the brokers have satisfied the requirements for subject-matter jurisdiction under CAFA. And the Court notes that this conclusion is in line with "CAFA's primary objective: ensuring 'Federal court consideration of interstate cases of national importance under diversity jurisdiction[.]'" *Knowles*, 568 U.S. at 595 (quoting Class Action Fairness Act of 2005, Pub. L. No. 109-2, § 2(b)(2), 119 Stat. 4, 5 (2005)).

### III. The Merits

Because the Court has subject-matter jurisdiction, it now considers UWM's motions to dismiss for failure to state a claim under Rule 12(b)(6).

### A. 12(b)(6) Standard of Review

In deciding a motion to dismiss under Rule 12(b)(6), the Court "construes the complaint in the light most favorable" to the brokers and determines whether their "complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Detailed factual allegations are not required to survive a motion to dismiss, *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 614 (6th Cir. 2012), but they must "raise a right to relief above the speculative level," *Bell Atlantic Corp.*

20

*v. Twombly*, 550 U.S. 544, 555 (2007). What is plausible is "a context-specific task" requiring this Court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## B. Analysis

UWM makes three arguments under Rule 12(b)(6). The first is easily dealt with. UWM asks the Court to dismiss the individually named plaintiffs because "none of the Individual Plaintiffs allege they entered into a contract with UWM. Rather, the Complaint uniformly alleges the Company Plaintiffs entered into the Agreement." (ECF No. 23, PageID.376.) The brokers have no issue with this request, so the motion is granted in part. (ECF No. 10, PageID.186 ("As to dismissal of the individually named Plaintiffs, as opposed to their company entities, the Court may dismiss them without objection.").)

The second argument—which was addressed above in the context of Rule 12(b)(1)—requires a bit more attention. Recall that UWM argues that brokers who submitted loans to UWM after the email was sent on March 12, 2020 "agreed to the amendment, ruling out the claims for breach of contract and declaratory relief[.]" (ECF No. 24, PageID.489.) And recall that—according to an affidavit submitted by UWM employee Julie Plotnik—only 24 brokers did not submit new loans after that date. *(Id.* at PageID.488–489 (citing ECF No. 24-3, PageID.506 (affidavit of Julie Plotnik)).) But just as the Court was forbidden from considering the merits of the claim under the 12(b)(1) standard, it is equally forbidden from considering Julie Plotnik's affidavit under the 12(b)(6) standard. *See Bassett v.*

*Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) ("When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss *so long as they are referred to in the Complaint* and are central to the claims contained therein."). So, again, UWM cannot make a back-door argument about subject-matter jurisdiction that both seeks to reach the merits of the claim and relies on an affidavit.

Setting aside any jurisdictional implications, the Court will finally consider UWM's contractual arguments on the merits. And, as is proper at the 12(b)(6) stage, the Court will only consider the complaint, the Wholesale Broker Agreement that was attached to the complaint, and the video that UWM cited in its motion to dismiss because the video is referenced in the complaint and is central to the brokers' claims. (ECF No. 1, PageID.8; ECF No. 1-1; United Wholesale Mortgage, "EPO POLICY CHANGE FOR 100 CLIENTS," https://perma.cc/5GB5-ZQAY); *See Bassett*, 528 F.3d at 430.

By the Broker Agreement's terms, the Court will apply Michigan law. (ECF No. 1-1, PageID.34.) To state a claim for breach of contract in Michigan, the brokers must allege "the existence and terms of a contract, that the defendant breached its terms, and that the breach caused damages to the plaintiff." *Van Buren Charter Twp. v. Visteon Corp.*, 904 N.W.2d 192, 202 (Mich. Ct. App. 2017) (citing *Miller-Davis Co. v. Ahrens Const., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014)). And "[u]nder ordinary contract principles, if contractual language is clear,

construction of the contract is a question of law for the court." *Id.* (citing *Meagher v. Wayne State Univ.*, 565 N.W.2d 401 (Mich. 1997)). Clear and unambiguous contractual language must be enforced as written. *Holland v. Trinity Health Care Corp.*, 791 N.W.2d 724 (Mich. 2010). And "[c]ourts must also give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003).

In relevant part, the contract reads: "7.01 Amendment of Agreement. Except as set forth on Section 7.08, this Agreement may not be amended except in writing executed by authorized representatives of both Broker and UWM." (ECF No. 1-1, PageID.33.) And section 7.08 says: "This Agreement, and UWM's policies, procedures, requirements and instructions concerning Mortgage Loan Applications and Mortgage Loans . . . may be amended by UWM from time to time . . . . Broker agrees that the submission of any Mortgage Loan Applications or Mortgage Loans to UWM after such amendment shall be Broker's agreement to the amendment without further signature or consent of any kind. *Any such amendment shall apply to pending, and/or future Mortgage Loan Applications submitted by Broker*." (*Id.* (emphasis added).)

Given this language, the brokers have successfully pled a plausible breach of contract claim. Their complaint identifies and attaches the Wholesale Broker Agreement, they allege that UWM violated section 7.08 by "retroactively appl[ying the 12-month EPO] to loans that had been closed and funded prior to

the amendment," and they allege that they were damaged by the breach. (ECF No. 1, PageID.8, 21–22.)

Resisting this conclusion, UWM makes several arguments. First, UWM makes two arguments that suggest that UWM could unilaterally and retroactively amend any portion of the agreement, including section 7.08. (ECF No. 15, PageID.291 ("UWM could always amend or modify Section 7.08.").) In other words, UWM accuses the brokers of trying to "pick and choose what portions of the Broker Agreement UWM is permitted to amend," when UWM believes it could amend any portion of it. (ECF No. 15, PageID.290.) To that end, UWM argues that it could amend the final sentence of 7.08, and, alternatively, that the limits of 7.08 only apply to "mortgage loan applications" and not already-existing "mortgage loans," which it could and did amend when it sent the 12-month EPO. (ECF No. 15, PageID.288, 290.)

But UWM's interpretation of the contract does not mention and gives no meaning to section 7.01. Section 7.01 states a general rule that the agreement "may not be amended except in writing executed by authorized representatives of both Broker and UWM," with the limited exception explained in 7.08. And section 7.08 permits UWM to make unilateral amendments that "shall apply to pending, and/or future Mortgage Loan Applications submitted by Broker." (ECF No. 1-1, PageID.33.) Reading these terms together, it appears that the contract can only be amended by either (1) a bilateral amendment in a writing per 7.01 or (2) a prospective amendment by UWM per 7.08. So UWM appears to be the party who

24

"cannot pick and choose what portions of the Broker Agreement UWM is permitted to amend." (ECF No. 15, PageID.290.) Indeed, 7.01 and 7.08 expressly limit what portions of the Broker Agreement UWM is permitted to amend.

That leaves one final argument, and it is one this Court has already considered twice in different procedural contexts: UWM's suggestion that some brokers cannot state a claim because they accepted the terms of the 12-month EPO by submitting new loans after the retroactive 12-month EPO was announced. (ECF No. 24, PageID.491.) Again, the brokers mostly agree. They repeatedly concede that section 7.08 permitted UWM to amend the contract for "pending, and/or future Mortgage Loan Applications submitted by Broker." (*See, e.g.,* ECF No. 1-1, PageID.33.) But the brokers insist that "Per [section 7.08], brokers cannot agree, by virtue of submitting new Mortgage Loan Applications or Mortgage Loans, to a Broker Agreement amendment that applies to loans that had already closed and funded as of the date of the amendment." (ECF No. 13, PageID.280.)

The Court agrees, and for similar reasons to those just explained. Section 7.08 says that the submission of new loan applications "shall" be the brokers' acceptance of a unilateral amendment proposed by UWM, and that any such amendment "shall" apply to pending and future loan applications. Nothing in 7.08 suggests that brokers can accept amendments to previously closed and funded loans merely by submitting new loan applications. So the Court looks to the more general rule provided in 7.01, which requires that the parties agree to amendments in "a writing executed by authorized representatives of both Broker

25

and UWM." Nothing in the materials the Court can consider on a 12(b)(6) motion suggest that such a writing exists here. Because neither 7.01 nor 7.08 seem to permit the brokers to accept a retroactive amendment merely by submitting new loans, the Court sees no reason why brokers who submitted new loan applications after March 12, 2020 fail to state a claim.

In conclusion, the Court finds that the brokers have stated a claim for breach of contract.

## IV. Conclusion

Accordingly, the Court GRANTS IN PART and DENIES IN PART UWM's motions to dismiss. (ECF Nos. 23, 24.) The Court GRANTS UWM's motion to dismiss the individually named plaintiffs for failure to state a claim. (ECF No. 23.) But, for the reasons explained above, it otherwise DENIES UWM's motions to dismiss the brokers' claims for lack of subject-matter jurisdiction and for failure to state a claim. (ECF Nos. 23, 24.)

SO ORDERED.

Dated: March 4, 2022

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE